**<u>Exhibit B</u>**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **BOB TUKIN**<br>        **Plaintiff,**<br><br>**v.**<br><br>**HALSTED FINANCIAL SERVICES,**<br>**LLC,**<br>        **Defendant** | **Case No. 1:21-cv-00025**<br>**Hon. Andrea R. Wood**<br>**Hon. Maria Valdez** |

## DEFENDANT'S INITIAL DISCLOSURES
## PURSUANT TO FED. R. CIV. P. 26(a)(1)

Defendant Halsted Financial Services, LLC ("Halsted") makes the following initial disclosures pursuant to FED. R. CIV. P. 26(a)(1)(A). These disclosures are based upon the information presently known and reasonably available to Halsted. Halsted makes these disclosures without waiving the right to supplement, delete, or modify them as further information is developed during discovery or otherwise. Furthermore, Halsted makes these disclosures without waiving the right to object, on proper grounds, to any other discovery request or proceeding involving or related to the subject matter of these disclosures.

### FED. R. CIV. R. 26(a)(1)(A)(i):

The name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

### Response:

Halsted identifies the following persons who are likely to have discoverable information related to the subject event(s) to which reference is made in Plaintiff's

Complaint, and to any injuries allegedly resulting from that event(s):

| Name | Subject of Information | Contact Information |
|---|---|---|
| Plaintiff Bob Tukin | Mr. Tukin likely has information regarding the allegations pled in their complaint, specifically, facts regarding their underlying Kay Jewelers credit card account, use of the credit card, knowledge regarding Halsted's letter, as well as information regarding the alleged damages. | c/o David M. Barshay, Esq.<br>Barshay, Rizzo & Lopez, PLLC<br>445 Broadway Road, Suite CL18<br>Melville, New York 11747<br>Tel.: 631.210.7272<br>Fax: 516.706.5055<br>E-mail: dbarshay@brlfirm.com |
| Representative of Halsted Financial Services, LLC | This representative has corporate knowledge of the collection activity taken on Mr. Tukin's account as well as corporate knowledge regarding Halsted's procedures. | Halsted Financial Services, LLC<br>8001 Lincoln Avenue<br>Suite 500<br>Skokie, IL 60077 |
| Corporate Representative of CVI SGP Acquisition Trust | This representative will have knowledge of the ownership of Plaintiff's account on the date of Defendant's letter. | CVI SGP Acquisition Trust<br>9320 Excelsior Boulevard<br>Hopkins, MN 55343-3444 |
| Corporate Representative of Resurgent Capital Services, LP | This representative will have knowledge of the fact that Resurgent Capital Services did not own Plaintiff's account on the date of Defendant's letter. | Resurgent Capital Services, LP<br>55 Beattie Place<br>Suite 400<br>Greenville, SC 29601 |
| Corporate Representative of FocusOne Data Systems, Inc. | This representative will have knowledge of the content and meaning of the bar code of which plaintiff complains. | FocusOne Data Systems, Inc.<br>13200 North Haggerty Road<br>Plymouth, Michigan 48170 |

Halsted further identifies any witness identified by the Plaintiff in their Initial

Disclosures and at any time during the discovery process. Halsted reserves the right to supplement this disclosure as appropriate.

**FED. R. CIV. P. 26(a)(1)(A)(ii):**

A copy – or a description by category and location – of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody or control and may use to support its claims or defenses, unless the use would be solely for impeachment.

**Response:**

At this time Halsted identifies the following documents:

1. Chain of title for Plaintiff's underlying credit card account, see Halsted_00001 – Halsted_00018;

2. Terms and conditions for Plaintiff's underlying credit card account, see Halsted_00019 – Halsted_00020;

3. Billing statements for Plaintiff's underlying credit card account, see Halsted_00021 – Halstead_00025;

4. Transaction history for Plaintiff's underlying credit card account, see Halsted_00026 – Halsted_00029;

5. Kay Jewelers Sales Slip(s), including Security Agreement, and receipts, see Halsted_00030 – Halsted_00033;

6. Plaintiff's account summary, see Halsted_00034; and

7. Correspondence sent from Halsted_00035 – Halsted_00038.

Halstead also identifies any documents disclosed by Plaintiff and reserves the right to supplement this disclosure as required by the Federal Rules of Civil Procedure.

**FED. R. CIV. P. 26(a)(1)(A)(iii):**

A computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copy as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of the injuries suffered.

**Response:**

Halsted has not asserted a claim for damages. Halsted calculates Plaintiff's actual damages to be $0.00. Halsted asserts that Plaintiff is entitled to no statutory damages, as no statutory violations occurred.

**FED. R. CIV. P. 26(a)(1)(A)(iv):**

For inspection and copying as under FED. R. CIV. P. 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

**Response:**

See Halted_00039 – Halsted_00058.

Respectfully submitted,

/s/ Nabil G. Foster

Nabil G. Foster
Barron & Newburger, PC
701 Main St. Suite 6396
Evanston, IL 60204
(312) 767-5750
nfoster@bn-lawyers.com
*Attorney for Defendant*
*Halsted Financial Services, LLC*

/s/ Manuel H. Newburger

Manuel H. Newburger
BARRON & NEWBURGER, P.C.
7320 N. MoPac Expy., Suite 400
Austin, Texas 78731
Telephone: (512) 649-4022
Facsimile: (512) 279-0310
mnewburger@bn-lawyers.com
*Attorney for Defendant*
*Halsted Financial Services, LLC*

## CERTIFICATE OF SERVICE

I, the undersigned attorney, hereby certify that a true copy of the above and foregoing *Defendant's Initial Disclosures Pursuant to* FED. R. CIV. P. 26(a) was served via ECF on the persons on the Service List below on the 30th day of March, 2021.

/s/ Manuel H. Newburger
Manuel H. Newburger

**SERVICE LIST:**

David M. Barshay, Esquire
BARSHAY, RIZZO & LOPEZ, PLLC
445 Broadhollow Road | Suite CL18
Melville, New York 11747
P. (631) 210-7272
F. (516) 706-5055
dbarshay@brlfirm.com

*Attorneys for Plaintiff*

## BILL OF SALE
## STERLING JEWELERS INC. TO CVI SGP ACQUISITION TRUST

As of March 11, 2019, for value received and in further consideration of the mutual covenants and conditions set forth in the Receivables Sale and Purchase Agreement (as may be amended, restated, supplemented or otherwise modified from time to time, the "Agreement"), dated as of March 12, 2018, by and among STERLING JEWELERS INC. ("Seller"), ZALE DELAWARE, INC., SIGNET JEWELERS LIMITED and CVI SGP ACQUISITION TRUST ("Buyer"), Seller hereby transfers, sells, conveys, grants, and delivers to Buyer, its permitted successors and assigns, to the extent of Seller's ownership, the Accounts as set forth in the Notification File, a copy of which is attached hereto and incorporated herein by reference as "Exhibit A". The parties hereto acknowledge and agree that legal title to each Account purchased by Buyer shall be held by, and in the name of, "Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Trustee of CVI SGP Acquisition Trust". Capitalized terms used but not otherwise defined herein shall have the meanings set forth in (or by reference in) the Agreement.

**STERLING JEWELERS INC.**

By:
Name: Suzanne M. Shane
Title: SVP Credit, Lease & Warranty Products

**CVI SGP ACQUISITION TRUST**

By: CVI SGP, LLC, as Administrator

By: CVI CVF III Master Fund I LP,
its Member/Manager

By: CarVal CVF III GP LP, its
General Partner

By: CarVal Carry GP Corp., its
General Partner

By:
Name: Christopher Hedberg
Title: Authorized Signatory

Receivables Sale and Purchase Agreement Bill of Sale (Sterling)

## EXHIBIT A

NOTIFICATION FILE

Notification File is an electronic file named 'GFS-RESURGENT-SUPP-20190306-5315.txt' and 'GFS-RESURGENT-SUPP-20190307-5316.txt' created on March 07, 2019, respectively, and is hereby incorporated by reference.

.

Receivables Sale and Purchase Agreement Bill of Sale (Sterling)

Halsted_00002

**EXECUTION COPY**

<u>ASSIGNMENT OF ACCOUNTS AND BILL OF SALE</u>

March 25, 2021

       Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as trustee of CVI SGP Acquisition Trust, as seller ("<u>Seller</u>"), for value received and pursuant to the terms and conditions of the Purchase and Sale Agreement ("<u>Agreement</u>"), dated as of even date herewith, by and among Seller, CVI SGP, LLC, and Resurgent Acquisitions LLC ("<u>Buyer</u>"), does hereby sell, assign and convey to Buyer, its successors and assigns, all right, title and interest of Seller in and to those certain Purchased Accounts listed in Exhibit A of the Agreement, including without limitation, the right to collect all principal and/or interest and/or other amounts due or to become due thereunder (including, without limitation, all amounts included in the related Unpaid Balances) and/or other proceeds of any kind paid or collected for payment thereon after the Cut-off Date, and all proceeds of the foregoing, without recourse and without representation of, or warranty of, collectability, or otherwise, except to the extent provided for in the Agreement.

       Capitalized terms used but not defined herein have the respective meanings assigned thereto in the Agreement.

*[Signature Page Follows.]*

740467692.2

Halsted_00003

Wilmington Savings Fund Society, FSB,
not in its individual capacity, but solely as trustee of CVI SGP Acquisition Trust,
as Seller

By: _____
Name: Shaheen Mohajer
Title:  Vice President

[Assignment of Accounts and Bill of Sale]

Halsted_00004

**Transfer and Assignment**

   Resurgent Acquisitions LLC ("RALLC"), without recourse, to the extent permitted by applicable law, hereby transfers, sells, assigns, conveys, grants and delivers to Resurgent Receivables LLC ("RRLLC") all of its right, title and interest in and to the receivables and other assets (the "Assets") identified on Exhibit A, in the Receivable File dated March 25, 2021 delivered by WSFS, FSB, as Trustee for CVI SGP Acquis. Trust on March 25, 2021 for purchase by RALLC on March 25, 2021. The transfer of the Assets included electronically stored business records.

Dated: **March 25, 2021**

Resurgent Acquisitions LLC
a Delaware Limited Liability Company

By: _____
   Name: Jackson Walker
   Title:   Authorized Representative

Dated: **March 25, 2021**

Resurgent Receivables LLC
a Delaware Limited Liability Company

By: _____
   Name: Daniel Picciano
   Title:   Authorized Representative

**Exhibit A**

## Receivables File

**03.25.21 CVI SGP Closing File ████ 322**

| Transfer Group | Portfolio | Transfer Batch |
|---|---|---|
| 725114 | 38496 | N/A |

| Account ID | PortfolioID | Originating Creditor | Merchant | OwnerNotes |
|---|---|---|---|---|
| ███162 | 38496 | Sterling Jewelers, Inc. | Kay | Sterling Jewelers, Inc. |

CommonSellerName

Seller

WSFS, FSB, as Trustee for CVI SGP Acquis. Trust

WSFS, FSB, as Trustee for CVI SGP Acquis. Trust

| AccountNumber | SSN | DateOfBirth | Prefix | BrwrFirstName | BrwrMiddleName |
|---|---|---|---|---|---|
| ███925 | ███ | 06/03/1985 | | Bob | V |

Halsted_00009

| BrwrLastName | Suffix | BrwrAddr1 |
|---|---|---|
| Tukin | | █████████ |

| BrwrAddr2 | City | State | Zip | Zip4 | HomePhone |
|-----------|------|-------|-----|------|-----------|
| | Saint Louis | MO | 63139 | 2119 | ███████ |

Halsted_00011

| WorkPhone | WirelessPhone | OtherPhone | EmpName | OrigInterestRate |
|---|---|---|---|---|
| ███████ | | ███████ | Throtle Net | 0 |

Halsted_00012

| FirstDelinqDate | OriginationDate | LastPmtDate | LastPmtAmt | LastPurchDate | LastPurchAmt |
|---|---|---|---|---|---|
| 08/13/2018 | 07/16/2014 | 06/04/2020 | 2385.48 | 10/16/2015 | |

Halsted_00013

| ChgOffDate | ChgOffBalance | PrincipalBalance | InterestBalance | MiscBalance | AttBalance | CurrBalance |
|---|---|---|---|---|---|---|
| 02/12/2019 | 3407.84 | 1022.36 | 0.00 | 0.00 | 0.00 | 1022.36 |

Halsted_00014

| EffectIntDate | JudgmentDate | JudgmentTotalAward | JudgmentPrinAward | JudgmentIntAward |
| --- | --- | --- | --- | --- |
| 07/06/2020 | | | | |

Halsted_00015

JudgmentCostAward    JudgmentFeeAward    JudgmentPostJudgmentIntRate    LawsuitFileDate

Halsted_00016

LawsuitCounty          LawsuitCourt

Halsted_00017

DocketNumber

Halsted_00018

**KAY KAY**

## SUMMARY OF KAY JEWELERS AND KAY JEWELERS OUTLET CHARGE ACCOUNT TERMS

### Interest Rates and Interest Charges

| Annual Percentage Rate (APR) for Purchases | 17% to 24.99% This APR varies by date. See Paragraph 3 of the Retail Installment Credit Agreement for details. |
| --- | --- |
| How to Avoid Paying Interest on Purchases | Your due date is at least 25 days after the close of each billing cycle. We will not charge you interest on purchases if you pay your entire balance by the due date each month. |
| Minimum Interest Charge | None to $1.00. The minimum interest charge varies by state. See Paragraph 3 of the Retail Installment Credit Agreement for details. |
| For Credit Card Tips from the Consumer Financial Protection Bureau | To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/learnmore. |

### Fees

| Annual Fee | None |
| --- | --- |
| Penalty Fees | |
| • Late Payment | Up to $37. The fee varies by state. See Paragraph 11 of the Retail Installment Credit Agreement for details. |
| • Returned Payment | Up to $37. The fee varies by state. See Paragraph 11 of the Retail Installment Credit Agreement for details. |

### FACTS — WHAT DOES KAY® JEWELERS AND KAY® JEWELERS OUTLET DO WITH YOUR PERSONAL INFORMATION?

| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| --- | --- |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and account balances<br>• payment history and transaction history<br>• credit history and credit scores<br>When you are no longer our customer, we continue to share your information as described in this notice. |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Kay® Jewelers and Kay® Jewelers Outlet chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Kay® Jewelers and Kay® Jewelers Outlet share? | Can you limit this sharing? |
| --- | --- | --- |
| For our everyday business purposes— such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | YES | NO |
| For our marketing purposes— to offer our products and services to you | YES | NO |
| For joint marketing with other financial companies | NO | We don't share. |
| For our affiliates' everyday business purposes— information about your transactions and experiences | NO | We don't share. |
| For our affiliates' everyday business purposes— information about your creditworthiness | NO | We don't share. |
| For our nonaffiliates to market to you | NO | We don't share. |

| Questions? | Visit www.kay.com or www.kayleaflet.com |
| --- | --- |

## What we do

| | |
|---|---|
| **How does Kay® Jewelers and Kay® Jewelers Outlet protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| **How does Kay® Jewelers and Kay® Jewelers Outlet collect my personal information?** | We collect your personal information, for example, when you • open an account or give us your contact information • pay your bills or apply for a loan • use your credit or debit card We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only • sharing for affiliates' everyday business purposes—information about your creditworthiness • affiliates from using your information to market to you • sharing for nonaffiliates to market to you State laws and individual companies may give you additional rights to limit sharing. |

## Definitions

| | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies. • Kay® Jewelers and Kay® Jewelers Outlet does not share. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies. • Kay® Jewelers and Kay® Jewelers Outlet does not share with nonaffiliates so they can market to you. |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you. • Kay® Jewelers and Kay® Jewelers Outlet does not joint market. |

## Other important information

If you reside in CA or VT, we do not share information to market to you pursuant to joint marketing agreements.

### Reward yourself with the finer things in life.
*The benefits are all yours.*

- Instant credit
- No annual fee
- Allows your store cards to be used for emergencies or other uses
- Convenient shopping in our stores nationwide
- Establishes a credit history to assist in future buying wants
- Customer Appreciation mailings
- You may return your purchase within 60 days or exchange it within 90 days of purchase. Watches may be exchanged or returned within 30 days provided they are in original condition (unworn and undamaged) and accompanied by the original packaging, instructions and warranty documents. Custom-designed merchandise, class rings, special-ordered watches and items engraved with personalized information cannot be returned or exchanged.
- Diamond is backed by our Lifetime Diamond Guarantee
- Extended Service Plan is available to protect your jewelry from future repair costs
- Payment Protection Plan is available to let you buy with peace of mind. This optional plan protects your credit and your purchases. See the Payment Protection brochure for details.

Kay Jewelers and Kay Jewelers Outlet Gold Exchange!
Exchange your gold for cash.
• Quick • Safe • Secure
Your Kay Jewelers or Kay Jewelers Outlet rep. for details.





Credit Card Application



# KAY JEWELERS OUTLET

**Payment Information**

| | |
|---|---|
| New Balance | $3,315.20 |
| Balance Payable To Avoid Further Interest Charges | $3,315.20 |
| Minimum Payment | $140.00 |
| Past Due | $1,810.00 |
| Total Due | $1,950.00 |
| Payment Due Date | 11/06/2017 |

**Late Payment Warning:** If we do not receive your minimum payment by the payment due date listed above, you may have to pay a late fee of up to $10.00.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 33 MONTHS | $4,481.89 |

If you would like information about credit counseling services, call 1-866-477-6322

**Customer Name**   Bob V Tukin
**Account #**   [ ]870

**Questions?** – Visit us at www.kayoutlet.com

**Please send billing inquiries and correspondence to:**
**(do not send payments to this address)**
P.O. Box 3680
Akron, OH 44309-3680

## Summary of Account Activity

| | |
|---|---|
| Previous Balance | $3,409.60 |
| Payments | $150.00– |
| Other Credits | $0.00 |
| Purchases and Other Charges | $0.00 |
| Fees Charged | $0.00 |
| Interest Charged | $55.60 |
| **New Balance** | **$3,315.20** |
| Statement closing date | 10/11/2017 |
| Days in billing cycle | 30 |

## Your Transactions

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| 09/13/2017 | 09/14/2017 | Payment – Thank You | $150.00– |

**Interest Charged**

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| 10/11/2017 | 10/12/2017 | Interest Charges | $55.60 |
| | | TOTAL INTEREST FOR THIS PERIOD | $55.60 |

NOTICE: *SEE REVERSE SIDE FOR IMPORTANT INFORMATION*

*PLEASE DETACH AND RETURN THIS PORTION WITH YOUR PAYMENT*



| Account # | xxxxxx1870 |
|---|---|
| New Balance | $3,315.20 |
| Due Date | 11/06/2017 |
| Total Due | $1,950.00 |
| Amount Enclosed | $ |

203

**Please make your check payable to KAY OUTLET**
Payment mailing address is for remittance only



100071

KAY OUTLET
P.O.Box 740425
Cincinnati OH 45274-0425

#BWNCKTF
# 16100037l4128703 #
Bob V Tukin
7037 Pernod Ave
St Louis MO 63139

To review important notices, click here

Address or Employment
Change?  Check Box and
complete Reverse Side

Payment Mailing Address:
P.O. Box 740425
Cincinnati, OH 45274-0425

Halsted_00021

## Your Transactions

| 2017 Totals Year To−Date | |
|---|---|
| Total fees charged in 2017 | $254.82 |
| Total interest charged in 2017 | $560.84 |

## Interest Charge Calculation

Your Annual Percentage Rate (APR) is the annual interest rate on your account.

Your Monthly Periodic Rate (MPR) is the monthly interest rate on your account.

| Type of Balance | Annual Percentage Rate(APR) | Monthly Periodic Rate(MPR) | Balance Subject To Interest Rate | Interest Charge |
|---|---|---|---|---|
| Purchases: Regular 24.99% | 24.99% | 2.0825% | $2,670.03 | $55.60 |

Messages:

**IMPORTANT CHANGE COMING SOON!** − Effective 10/22/17, the provider of your Credit Card Account (currently issued by Sterling Jewelers Inc.) will be changing. The new provider will be the issuer of your Credit Card Account. Please note that if you have recurring or future dated payments scheduled with Sterling after 10/21/17, those will not be processed. Instead, you will need to direct your payment after that date to the new provider. More details about the new provider and these changes, including where to direct payments, will be mailed to you shortly.

**You may pay by phone to receive immediate credit to your account at 1−800−877−3616.** To take advantage of the pay by phone option, your complete account number and the last 4 digits of your social security number will be required. By providing this information to us, you are authenticating your authorization to an immediate withdrawal from your deposit account. You will have the option to cancel the payment prior to completing the transaction.

To review important notices, click here



7637-0000-1050-7925

GENESIS FS CARD SERVICES
PO BOX 4480
BEAVERTON OR 97076-4480

| Account Number | ■■■■-7925 |
|---|---|
| New Balance | **$3,347.30** |
| Minimum Payment Due | **$1,015.00** |
| Payment Due Date | **02/10/19** |
| AMOUNT ENCLOSED | $ |



GENESIS FS CARD SERVICES
PO BOX 23013
COLUMBUS GA 31902-3013

■ Make check/money
order payable to

Please write your account number on your check/money order
and do not send cash.

BOB V TUKIN          **0000000
SAINT LOUIS MO 63139-2119

☐ Please check here and complete Address/Phone
Number Change Form on reverse side.

**Make your payment online at kay.myfinanceservice.com**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Please detach this portion and return with your payment to ensure proper credit. Retain lower portion for your records.

**ACCOUNT STATEMENT**
-7925
December 12, 2018 - January 11, 2019

| Account Summary | |
|---|---|
| Credit Limit | $3,371.00 |
| Available Credit | $0.00 |
| Past Due Amount | $861.00 |
| Overlimit Amount | $0.00 |
| Statement Closing Date | January 11, 2019 |
| # of Days in Billing Cycle | 31 |

| Balance Summary | |
|---|---|
| Previous Balance | $3,286.76 |
| Payments | $0.00 |
| Other Credits | $0.00 |
| Purchases | $0.00 |
| Adjustments | $0.00 |
| **Fees Charged** | **$5.00** |
| **Interest Charged** | **$55.54** |
| New Balance | $3,347.30 |

| Payment Information | |
|---|---|
| **Total New Balance** | **$3,347.30** |
| **Minimum Payment Due** | **$1,015.00** |
| **Payment Due Date** | **February 10, 2019** |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $5.00.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this account and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 6 years | $4,872 |

If you would like information about credit counseling services, call 1-866-875-0891 .

| **Mail payment to:** | **Please mail billing inquiries to:** | **QUESTIONS?** |
|---|---|---|
| Genesis FS Card Services | Genesis FS Card Services | Call 1-866-875-0891 |
| PO BOX 23013 | P.O. Box 4485 | kay.myfinanceservice.com |
| COLUMBUS GA 31902-3013 | Beaverton, OR 97076-4485 | |

YOUR ACCOUNT IS PAST DUE $861.00. THE PAST DUE AMOUNT IS INCLUDED
IN THE MINIMUM PAYMENT. PLEASE REMIT IMMEDIATELY.

| Fees | | | | |
|---|---|---|---|---|
| **Reference Number** | **Tran Date** | **Post Date** | **Description of Transaction or Credit** | **Amount** |
| | 12/21 | 12/21 | LATE PAYMENT CHARGE | $5.00 |
| | | | **TOTAL FEES FOR THIS PERIOD** | **$5.00** |

| Interest Charged | | | | |
|---|---|---|---|---|
| **Reference Number** | **Tran Date** | **Post Date** | **Description of Transaction or Credit** | **Amount** |
| ADB- 1,688.34 | 01/11 | 01/11 | INTEREST CHARGE - SGCNOPTI | $35.15 |
| ADB- 979.41 | 01/11 | 01/11 | INTEREST CHARGE - SGCNOPTI | $20.39 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | **$55.54** |

| 2019 Totals Year-to-Date | |
|---|---|
| Total fees charged in 2019 | $5.00 |
| Total interest charged in 2019 | $55.54 |

PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION

Halsted_00023

7637-0000-1050-7925

**ACCOUNT STATEMENT**
7637-0000-1050-7925
December 12, 2018 - January 11, 2019

| | **Interest Charge Calculation** | | | | | |
|---|---|---|---|---|---|---|

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Balance | Promotion End Date | Average Daily Balance | Annual Percentage Rate(APR) | Deferred Interest | Billed Interest |
|---|---|---|---|---|---|---|
| Regular | $0.00 | N/A | $0.00 | 26.99% | N/A | $0.00 |
| PURCHASE CONV | $1,122.14 | N/A | $979.41 | 24.99% | N/A | $20.39 |
| Transaction Date: 07/25/14 | | | | | | |
| PURCHASE CONV | $1,934.39 | N/A | $1,688.34 | 24.99% | N/A | $35.15 |
| Transaction Date: 10/16/15 | | | | | | |
| OTHER MISC/FEES | $260.77 | N/A | $260.77 | 0.00% | N/A | $0.00 |
| Transaction Date: 10/11/17 | | | | | | |
| Misc\Fees | $30.00 | N/A | $0.00 | 0.00% | N/A | $0.00 |

(v) = Variable Rate

Halsted_00024

7837-0000-1050-7925

Halsted_00025

| Date | Transaction | Amount | Tran# | MktPg | Cater | 15Pt | 80008 | |
|---|---|---|---|---|---|---|---|---|
| 10/11/2017 | Interest Charges | 55.6 | 1017 CHRG | | 2945 | 171011 | 3315.2 | |
| 9/13/2017 | Payment - Thank You | -150 | 544 | | 4613 | 273 | 3259.6 | |
| 9/11/2017 | Credit Property Premium | 5.01 | 917 CHRG | | 2945 | 170911 | 3409.6 | |
| 9/11/2017 | Interest Charges | 56.49 | 917 CHRG | | 2945 | 170911 | 3404.59 | |
| 9/11/2017 | Credit Unemployment Premium | 9.22 | 917 CHRG | | 2945 | 170911 | 3348.1 | |
| 9/11/2017 | Credit Life Premium | 3.25 | 917 CHRG | | 2945 | 170911 | 3338.88 | |
| 9/11/2017 | Credit Disability Premium | 5.42 | 917 CHRG | | 2945 | 170911 | 3335.63 | |
| 9/11/2017 | Late Fee | 10 | 917 CHRG | | 2945 | 170811 | 3330.21 | |
| 8/11/2017 | Credit Disability Premium | 5.38 | 817 CHRG | | 2945 | 170811 | 3320.21 | |
| 8/11/2017 | Credit Life Premium | 3.22 | 817 CHRG | | 2945 | 170811 | 3314.83 | |
| 8/11/2017 | Interest Charges | 56.02 | 817 CHRG | | 2945 | 170811 | 3311.61 | |
| 8/11/2017 | Credit Unemployment Premium | 9.14 | 817 CHRG | | 2945 | 170811 | 3255.59 | |
| 8/11/2017 | Credit Property Premium | 4.97 | 817 CHRG | | 2945 | 170811 | 3246.45 | |
| 7/11/2017 | Late Fee | 10 | 717 CHRG | | 2945 | 170611 | 3241.48 | |
| 7/11/2017 | Interest Charges | 55.6 | 717 CHRG | | 2945 | 170711 | 3231.48 | |
| 7/11/2017 | Credit Life Premium | 3.2 | 717 CHRG | | 2945 | 170711 | 3175.88 | |
| 7/11/2017 | Credit Property Premium | 4.93 | 717 CHRG | | 2945 | 170711 | 3172.68 | |
| 7/11/2017 | Credit Unemployment Premium | 9.07 | 717 CHRG | | 2945 | 170711 | 3167.75 | |
| 7/11/2017 | Credit Disability Premium | 5.34 | 717 CHRG | | 2945 | 170711 | 3158.68 | |
| 6/13/2017 | Payment - Thank You | -140 | 6016 | | 4613 | 164 | 3153.34 | |
| 6/11/2017 | Credit Disability Premium | 5.42 | 617 CHRG | | 2945 | 170611 | 3293.34 | |
| 6/11/2017 | Credit Property Premium | 5.01 | 617 CHRG | | 2945 | 170611 | 3287.92 | |
| 6/11/2017 | Credit Life Premium | 3.25 | 617 CHRG | | 2945 | 170611 | 3282.91 | |
| 6/11/2017 | Interest Charges | 56.5 | 617 CHRG | | 2945 | 170611 | 3279.66 | |
| 6/11/2017 | Credit Unemployment Premium | 9.22 | 617 CHRG | | 2945 | 170611 | 3223.16 | |
| 6/11/2017 | Late Fee | 10 | 617 CHRG | | 2945 | 170507 | 3213.94 | |
| 5/7/2017 | Credit Disability Premium | 5.38 | 517 CHRG | | 2104 | 170507 | 3203.94 | |
| 5/7/2017 | Credit Life Premium | 3.22 | 517 CHRG | | 2104 | 170507 | 3198.56 | |
| 5/7/2017 | Interest Charges | 56.03 | 517 CHRG | | 2104 | 170507 | 3195.34 | |
| 5/7/2017 | Credit Unemployment Premium | 9.14 | 517 CHRG | | 2104 | 170507 | 3139.31 | |
| 5/7/2017 | Credit Property Premium | 4.97 | 517 CHRG | | 2104 | 170507 | 3130.17 | |
| 4/7/2017 | Late Fee | 10 | 417 CHRG | | 2104 | 170307 | 3125.2 | |
| 4/7/2017 | Interest Charges | 56.25 | 417 CHRG | | 2104 | 170407 | 3115.2 | |
| 4/7/2017 | Credit Life Premium | 3.24 | 417 CHRG | | 2104 | 170407 | 3058.95 | |
| 4/7/2017 | Credit Property Premium | 4.99 | 417 CHRG | | 2104 | 170407 | 3055.71 | |
| 4/7/2017 | Credit Unemployment Premium | 9.18 | 417 CHRG | | 2104 | 170407 | 3050.72 | |
| 4/7/2017 | Credit Disability Premium | 5.4 | 417 CHRG | | 2104 | 170407 | 3041.54 | |
| 3/31/2017 | Payment - Thank You | -140 | 2041 | | 4600 | 905 | 3036.14 | |
| 3/7/2017 | Interest Charges | 56.03 | 317 CHRG | | 2104 | 170307 | 3176.14 | |
| 3/7/2017 | Credit Life Premium | 3.22 | 317 CHRG | | 2104 | 170307 | 3120.11 | |
| 3/7/2017 | Credit Property Premium | 4.97 | 317 CHRG | | 2104 | 170307 | 3116.89 | |
| 3/7/2017 | Credit Disability Premium | 5.38 | 317 CHRG | | 2104 | 170307 | 3111.92 | |
| 3/7/2017 | Credit Unemployment Premium | 9.14 | 317 CHRG | | 2104 | 170307 | 3106.54 | |
| 2/7/2017 | Credit Disability Premium | 5.4 | 217 CHRG | | 2104 | 170207 | 3097.4 | |
| 2/7/2017 | Credit Property Premium | 5 | 217 CHRG | | 2104 | 170207 | 3092 | |
| 2/7/2017 | Credit Life Premium | 3.24 | 217 CHRG | | 2104 | 170207 | 3087 | |
| 2/7/2017 | Interest Charges | 56.29 | 217 CHRG | | 2104 | 170207 | 3083.76 | |
| 2/7/2017 | Credit Unemployment Premium | 9.19 | 217 CHRG | | 2104 | 170207 | 3027.47 | |
| 2/7/2017 | Late Fee | 10 | 217 CHRG | | 2104 | 170107 | 3018.28 | |
| 2/1/2017 | Payment - Thank You | -140 | 8910 | | 4600 | 1110 | 3008.28 | |
| 1/7/2017 | Credit Unemployment Premium | 9.14 | 117 CHRG | | 2104 | 170107 | 3148.28 | |
| 1/7/2017 | Credit Property Premium | 4.97 | 117 CHRG | | 2104 | 170107 | 3139.14 | |
| 1/7/2017 | Credit Life Premium | 3.22 | 117 CHRG | | 2104 | 170107 | 3134.17 | |
| 1/7/2017 | Interest Charges | 56.03 | 117 CHRG | | 2104 | 170107 | 3130.95 | |
| 1/7/2017 | Credit Disability Premium | 5.38 | 117 CHRG | | 2104 | 170107 | 3074.92 | |
| 12/7/2016 | Credit Property Premium | 5.01 | 1216 CHRG | | 2104 | 161207 | 3069.54 | |
| 12/7/2016 | Credit Life Premium | 3.25 | 1216 CHRG | | 2104 | 161207 | 3064.53 | |
| 12/7/2016 | Interest Charges | 56.5 | 1216 CHRG | | 2104 | 161207 | 3061.28 | |
| 12/7/2016 | Late Fee | 10 | 1216 CHRG | | 2104 | 161107 | 3004.78 | |

Halsted_00026

| Date | Description | Amount | | | | | Balance |
|---|---|---|---|---|---|---|---|
| 12/7/2016 | Credit Unemployment Premium | 9.22 | 1216 | CHRG | 2104 | 161207 | 2985.56 |
| 12/7/2016 | Credit Disability Premium | 5.42 | 1216 | CHRG | 2104 | 161207 | 2985.56 |
| 11/28/2016 | Payment - Thank You | -95 | 3204 | | 4600 | 1363 | 2980.14 |
| 11/7/2016 | Credit Property Premium | 5.01 | 1116 | CHRG | 2104 | 161107 | 3075.14 |
| 11/7/2016 | Credit Life Premium | 3.25 | 1116 | CHRG | 2104 | 161107 | 3070.13 |
| 11/7/2016 | Interest Charges | 36.11 | 1116 | CHRG | 2104 | 161107 | 3066.88 |
| 11/7/2016 | Late Fee | 10 | 1116 | CHRG | 2104 | 161007 | 3030.77 |
| 11/7/2016 | Credit Unemployment Premium | 9.21 | 1116 | CHRG | 2104 | 161107 | 3020.77 |
| 11/7/2016 | Credit Disability Premium | 5.41 | 1116 | CHRG | 2104 | 161107 | 3011.56 |
| 11/4/2016 | Payment Adjustment | 110 | 1271 | | 10 | 100316 | 3006.15 |
| 11/1/2016 | Payment - Thank You | -110 | 2382 | | 4600 | 777777 | 2896.15 |
| 10/7/2016 | Interest Charges | 35.82 | 1016 | CHRG | 2104 | 161007 | 3006.15 |
| 10/7/2016 | Credit Life Premium | 3.22 | 1016 | CHRG | 2104 | 161007 | 2970.33 |
| 10/7/2016 | Credit Property Premium | 4.97 | 1016 | CHRG | 2104 | 161007 | 2967.11 |
| 10/7/2016 | Credit Unemployment Premium | 9.13 | 1016 | CHRG | 2104 | 161007 | 2962.14 |
| 10/7/2016 | Credit Disability Premium | 5.37 | 1016 | CHRG | 2104 | 161007 | 2953.01 |
| 10/5/2016 | Payment Adjustment | 105 | 5613 | | 10 | 101401 | 2947.64 |
| 9/30/2016 | Payment - Thank You | -105 | 6288 | | 4600 | 777777 | 2842.64 |
| 9/7/2016 | Interest Charges | 36.06 | 916 | CHRG | 2104 | 160907 | 2947.64 |
| 9/7/2016 | Credit Property Premium | 5 | 916 | CHRG | 2104 | 160907 | 2911.58 |
| 9/7/2016 | Credit Life Premium | 3.24 | 916 | CHRG | 2104 | 160907 | 2906.58 |
| 9/7/2016 | Credit Unemployment Premium | 9.19 | 916 | CHRG | 2104 | 160907 | 2903.34 |
| 9/7/2016 | Credit Disability Premium | 5.41 | 916 | CHRG | 2104 | 160907 | 2894.15 |
| 8/25/2016 | Payment - Thank You | -285 | 1971 | | 4600 | 1200 | 2888.74 |
| 8/7/2016 | Interest Charges | 56.97 | 0 | CHRG | 2104 | 160807 | 3173.74 |
| 8/7/2016 | Late Fee | 10 | 816 | CHRG | 2104 | 160807 | 3116.77 |
| 7/7/2016 | Credit Property Premium | 5.01 | 716 | CHRG | 2104 | 160707 | 3106.77 |
| 7/7/2016 | Credit Life Premium | 3.25 | 716 | CHRG | 2104 | 160707 | 3101.76 |
| 7/7/2016 | Interest Charges | 56.49 | 716 | CHRG | 2104 | 160707 | 3098.51 |
| 7/7/2016 | Late Fee | 10 | 716 | CHRG | 2104 | 160607 | 3042.02 |
| 7/7/2016 | Credit Unemployment Premium | 9.22 | 716 | CHRG | 2104 | 160707 | 3032.02 |
| 7/7/2016 | Credit Disability Premium | 5.42 | 716 | CHRG | 2104 | 160707 | 3022.8 |
| 6/7/2016 | Credit Property Premium | 4.97 | 616 | CHRG | 2104 | 160607 | 3017.38 |
| 6/7/2016 | Interest Charges | 56.02 | 616 | CHRG | 2104 | 160607 | 3012.41 |
| 6/7/2016 | Credit Disability Premium | 5.38 | 616 | CHRG | 2104 | 160607 | 2956.39 |
| 6/7/2016 | Credit Life Premium | 3.22 | 616 | CHRG | 2104 | 160607 | 2951.01 |
| 6/7/2016 | Credit Unemployment Premium | 9.14 | 616 | CHRG | 2104 | 160607 | 2947.79 |
| 5/7/2016 | Interest Charges | 55.55 | 516 | CHRG | 2104 | 160507 | 2938.65 |
| 5/7/2016 | Credit Life Premium | 3.2 | 516 | CHRG | 2104 | 160507 | 2883.1 |
| 5/7/2016 | Credit Unemployment Premium | 9.07 | 516 | CHRG | 2104 | 160507 | 2879.9 |
| 5/7/2016 | Credit Disability Premium | 5.33 | 516 | CHRG | 2104 | 160507 | 2870.83 |
| 5/7/2016 | Credit Property Premium | 4.93 | 516 | CHRG | 2104 | 160507 | 2865.5 |
| 4/8/2016 | Payment - Thank You | -140 | 9321 | | 4600 | 1922 | 2860.57 |
| 4/7/2016 | Late Fee | 10 | 416 | CHRG | 2104 | 160307 | 3000.57 |
| 4/7/2016 | Interest Charges | 56.49 | 416 | CHRG | 2104 | 160407 | 2990.57 |
| 4/7/2016 | Credit Life Premium | 3.25 | 416 | CHRG | 2104 | 160407 | 2934.08 |
| 4/7/2016 | Credit Disability Premium | 5.42 | 416 | CHRG | 2104 | 160407 | 2930.83 |
| 4/7/2016 | Credit Unemployment Premium | 9.22 | 416 | CHRG | 2104 | 160407 | 2925.41 |
| 4/7/2016 | Credit Property Premium | 5.01 | 416 | CHRG | 2104 | 160407 | 2916.19 |
| 3/7/2016 | Credit Disability Premium | 5.28 | 316 | CHRG | 2104 | 160307 | 2911.18 |
| 3/7/2016 | Credit Property Premium | 4.88 | 316 | CHRG | 2104 | 160307 | 2905.9 |
| 3/7/2016 | Credit Life Premium | 3.16 | 316 | CHRG | 2104 | 160307 | 2901.02 |
| 3/7/2016 | Interest Charges | 54.98 | 316 | CHRG | 2104 | 160307 | 2897.86 |
| 3/7/2016 | Credit Unemployment Premium | 8.97 | 316 | CHRG | 2104 | 160307 | 2842.88 |
| 3/7/2016 | Payment Adjustment | 420 | 7504 | | 10 | 102263 | 2833.91 |
| 3/2/2016 | Payment - Thank You | -420 | 1253 | | 4600 | 777777 | 2413.91 |
| 2/18/2016 | Payment Adjustment | 140 | 3565 | | 10 | 100228 | 2833.91 |
| 2/15/2016 | Payment - Thank You | -140 | 9509 | | 4600 | 777777 | 2693.91 |
| 2/7/2016 | Credit Unemployment Premium | 9.09 | 216 | CHRG | 2104 | 160227 | 2833.91 |
| 2/7/2016 | Credit Property Premium | 4.94 | 216 | CHRG | 2104 | 160207 | 2824.82 |

Halsted_00027

| Date | Description | Amount | | | | | Balance |
|---|---|---|---|---|---|---|---|
| 2/7/2016 | Credit Life Premium | 3.2 | 216 CHRG | 2104 | 160207 | 2761 | |
| 2/7/2016 | Interest Charges | 55.68 | 216 CHRG | 2104 | 160207 | 2816.68 | |
| 2/7/2016 | Credit Disability Premium | 5.34 | 216 CHRG | 2104 | 160207 | 2761 | |
| 1/11/2016 | Payment - Thank You | -140 | 8714 | 4600 | 1773 | 2755.66 | |
| 1/7/2016 | Credit Disability Premium | 5.4 | 116 CHRG | 2104 | 160107 | 2895.66 | |
| 1/7/2016 | Credit Property Premium | 4.99 | 116 CHRG | 2104 | 160107 | 2890.26 | |
| 1/7/2016 | Credit Life Premium | 3.24 | 116 CHRG | 2104 | 160107 | 2885.27 | |
| 1/7/2016 | Interest Charges | 56.27 | 116 CHRG | 2104 | 160107 | 2882.03 | |
| 1/7/2016 | Credit Unemployment Premium | 9.18 | 116 CHRG | 2104 | 160107 | 2825.76 | |
| 12/15/2015 | Payment Adjustment | 140 | 8050 | 10 | 101004 | 2816.58 | |
| 12/9/2015 | Payment - Thank You | -140 | 1597 | 4600 | 777777 | 2676.58 | |
| 12/7/2015 | Credit Property Premium | 4.97 | 1215 CHRG | 2104 | 151207 | 2816.58 | |
| 12/7/2015 | Credit Disability Premium | 5.37 | 1215 CHRG | 2104 | 151207 | 2811.61 | |
| 12/7/2015 | Credit Life Premium | 3.22 | 1215 CHRG | 2104 | 151207 | 2806.24 | |
| 12/7/2015 | Interest Charges | 55.97 | 1215 CHRG | 2104 | 151207 | 2803.02 | |
| 12/7/2015 | Credit Unemployment Premium | 9.13 | 1215 CHRG | 2104 | 151207 | 2747.05 | |
| 11/7/2015 | Credit Life Premium | 2.87 | 1115 CHRG | 2104 | 151107 | 2737.92 | |
| 11/7/2015 | Credit Property Premium | 4.43 | 1115 CHRG | 2104 | 151107 | 2735.05 | |
| 11/7/2015 | Credit Disability Premium | 4.79 | 1115 CHRG | 2104 | 151107 | 2730.62 | |
| 11/7/2015 | Credit Unemployment Premium | 8.15 | 1115 CHRG | 2104 | 151107 | 2725.83 | |
| 11/7/2015 | Interest Charges | 49.93 | 1115 CHRG | 2104 | 151107 | 2717.68 | |
| 10/16/2015 | PURCHASES | 1688.34 | 2467 REG | 379 | 24355 | 2667.75 | |
| 10/16/2015 | Payment - Thank You | -720 | 5269 | 4600 | 541 | 979.41 | |
| 10/8/2015 | Payment - Thank You | -120 | 7559 | 4600 | 555 | 1699.41 | |
| 10/7/2015 | Interest Charges | 34.34 | 1015 CHRG | 2104 | 151007 | 1819.41 | |
| 10/7/2015 | Credit Unemployment Premium | 5.6 | 1015 CHRG | 2104 | 151007 | 1785.07 | |
| 10/7/2015 | Credit Disability Premium | 3.29 | 1015 CHRG | 2104 | 151007 | 1779.47 | |
| 10/7/2015 | Credit Property Premium | 3.05 | 1015 CHRG | 2104 | 151007 | 1776.18 | |
| 10/7/2015 | Credit Life Premium | 1.97 | 1015 CHRG | 2104 | 151007 | 1773.13 | |
| 10/7/2015 | Late Fee | 10 | 1015 CHRG | 2104 | 150907 | 1771.16 | |
| 9/7/2015 | Credit Disability Premium | 3.27 | 915 CHRG | 2104 | 150907 | 1761.16 | |
| 9/7/2015 | Credit Life Premium | 1.96 | 915 CHRG | 2104 | 150907 | 1757.89 | |
| 9/7/2015 | Interest Charges | 34.05 | 915 CHRG | 2104 | 150907 | 1755.93 | |
| 9/7/2015 | Credit Property Premium | 3.02 | 915 CHRG | 2104 | 150907 | 1721.88 | |
| 9/7/2015 | Credit Unemployment Premium | 5.55 | 915 CHRG | 2104 | 150907 | 1718.86 | |
| 8/7/2015 | Late Fee | 10 | 815 CHRG | 2104 | 150707 | 1713.31 | |
| 8/7/2015 | Interest Charges | 33.9 | 815 CHRG | 2104 | 150807 | 1703.31 | |
| 8/7/2015 | Credit Life Premium | 1.95 | 815 CHRG | 2104 | 150807 | 1669.41 | |
| 8/7/2015 | Credit Property Premium | 3.01 | 815 CHRG | 2104 | 150807 | 1667.46 | |
| 8/7/2015 | Credit Unemployment Premium | 5.53 | 815 CHRG | 2104 | 150807 | 1664.45 | |
| 8/7/2015 | Credit Disability Premium | 3.25 | 815 CHRG | 2104 | 150807 | 1658.92 | |
| 7/13/2015 | Payment - Thank You | -120 | 3046 | 4600 | 1568 | 1655.67 | |
| 7/7/2015 | Credit Disability Premium | 3.29 | 715 CHRG | 2104 | 150707 | 1775.67 | |
| 7/7/2015 | Credit Property Premium | 3.05 | 715 CHRG | 2104 | 150707 | 1772.38 | |
| 7/7/2015 | Credit Life Premium | 1.97 | 715 CHRG | 2104 | 150707 | 1769.33 | |
| 7/7/2015 | Interest Charges | 34.34 | 715 CHRG | 2104 | 150707 | 1767.36 | |
| 7/7/2015 | Late Fee | 10 | 715 CHRG | 2104 | 150607 | 1733.02 | |
| 7/7/2015 | Credit Unemployment Premium | 5.6 | 715 CHRG | 2104 | 150607 | 1723.02 | |
| 6/7/2015 | Credit Disability Premium | 3.27 | 615 CHRG | 2104 | 150607 | 1717.42 | |
| 6/7/2015 | Credit Unemployment Premium | 5.56 | 615 CHRG | 2104 | 150607 | 1714.15 | |
| 6/7/2015 | Credit Property Premium | 3.02 | 615 CHRG | 2104 | 150607 | 1708.59 | |
| 6/7/2015 | Credit Life Premium | 1.96 | 615 CHRG | 2104 | 150607 | 1705.57 | |
| 6/7/2015 | Interest Charges | 34.05 | 615 CHRG | 2104 | 150607 | 1703.61 | |
| 5/7/2015 | Credit Disability Premium | 3.28 | 515 CHRG | 2104 | 150507 | 1669.56 | |
| 5/7/2015 | Interest Charges | 34.23 | 515 CHRG | 2104 | 150507 | 1666.28 | |
| 5/7/2015 | Credit Life Premium | 1.97 | 515 CHRG | 2104 | 150507 | 1632.05 | |
| 5/7/2015 | Credit Unemployment Premium | 5.58 | 515 CHRG | 2104 | 150507 | 1630.08 | |
| 5/7/2015 | Credit Property Premium | 3.04 | 515 CHRG | 2104 | 150507 | 1624.5 | |
| 4/16/2015 | Payment - Thank You | -120 | 1948 | 4600 | 777777 | 1621.46 | |
| 4/7/2015 | Interest Charges | 35.45 | 415 CHRG | 2104 | 150407 | 1741.46 | |

Halsted_00028

| Date | Description | Amount | Ref | Type | | | |
|---|---|---|---|---|---|---|---|
| 4/7/2015 | Credit Life Premium | 2.04 | 415 | CHRG | 2104 | 150407 | 1705.97 |
| 4/7/2015 | Credit Property Premium | 3.14 | 415 | CHRG | 2104 | 150407 | 1703.97 |
| 4/7/2015 | Credit Disability Premium | 3.4 | 415 | CHRG | 2104 | 150407 | 1700.83 |
| 4/7/2015 | Credit Unemployment Premium | 5.78 | 415 | CHRG | 2104 | 150407 | 1697.43 |
| 3/12/2015 | Payment - Thank You | -120 | 3608 | | 4600 | 777777 | 1691.65 |
| 3/7/2015 | Credit Life Premium | 2.14 | 315 | CHRG | 2104 | 150307 | 1811.65 |
| 3/7/2015 | Credit Property Premium | 3.3 | 315 | CHRG | 2104 | 150307 | 1809.51 |
| 3/7/2015 | Credit Unemployment Premium | 6.06 | 315 | CHRG | 2104 | 150307 | 1806.21 |
| 3/7/2015 | Interest Charges | 37.17 | 315 | CHRG | 2104 | 150307 | 1800.15 |
| 3/7/2015 | Credit Disability Premium | 3.57 | 315 | CHRG | 2104 | 150307 | 1762.98 |
| 2/18/2015 | Payment - Thank You | -120 | 812 | | 4600 | 777777 | 1759.41 |
| 2/7/2015 | Credit Unemployment Premium | 6.2 | 215 | CHRG | 2104 | 150207 | 1879.41 |
| 2/7/2015 | Interest Charges | 38.01 | 215 | CHRG | 2104 | 150207 | 1873.21 |
| 2/7/2015 | Credit Life Premium | 2.19 | 215 | CHRG | 2104 | 150207 | 1835.2 |
| 2/7/2015 | Credit Property Premium | 3.37 | 215 | CHRG | 2104 | 150207 | 1833.01 |
| 2/7/2015 | Late Fee | 10 | 215 | CHRG | 2104 | 150107 | 1829.64 |
| 2/7/2015 | Credit Disability Premium | 3.65 | 215 | CHRG | 2104 | 150207 | 1819.64 |
| 1/17/2015 | Payment - Thank You | -120 | 5258 | | 4600 | 2599 | 1815.99 |
| 1/7/2015 | Interest Charges | 38.15 | 115 | CHRG | 2104 | 150107 | 1935.99 |
| 1/7/2015 | Credit Property Premium | 3.38 | 115 | CHRG | 2104 | 150107 | 1897.84 |
| 1/7/2015 | Credit Disability Premium | 3.66 | 115 | CHRG | 2104 | 150107 | 1894.46 |
| 1/7/2015 | Credit Unemployment Premium | 6.23 | 115 | CHRG | 2104 | 150107 | 1890.8 |
| 1/7/2015 | Credit Life Premium | 2.19 | 115 | CHRG | 2104 | 150107 | 1884.57 |
| 12/7/2014 | Credit Disability Premium | 3.83 | 1214 | CHRG | 2104 | 141207 | 1882.38 |
| 12/7/2014 | Credit Property Premium | 3.55 | 1214 | CHRG | 2104 | 141207 | 1878.55 |
| 12/7/2014 | Credit Life Premium | 2.3 | 1214 | CHRG | 2104 | 141207 | 1875 |
| 12/7/2014 | Interest Charges | 39.97 | 1214 | CHRG | 2104 | 141207 | 1872.7 |
| 12/7/2014 | Late Fee | 10 | 1214 | CHRG | 2104 | 141107 | 1832.73 |
| 12/7/2014 | Credit Unemployment Premium | 6.52 | 1214 | CHRG | 2104 | 141207 | 1822.73 |
| 11/29/2014 | Payment - Thank You | -240 | 6309 | | 4600 | 667 | 1816.21 |
| 11/7/2014 | Credit Disability Premium | 3.89 | 1114 | CHRG | 2104 | 141107 | 2056.21 |
| 11/7/2014 | Credit Life Premium | 2.33 | 1114 | CHRG | 2104 | 141107 | 2052.32 |
| 11/7/2014 | Interest Charges | 40.55 | 1114 | CHRG | 2104 | 141107 | 2049.99 |
| 11/7/2014 | Credit Property Premium | 3.6 | 1114 | CHRG | 2104 | 141107 | 2009.44 |
| 11/7/2014 | Credit Unemployment Premium | 6.62 | 1114 | CHRG | 2104 | 141107 | 2005.84 |
| 10/7/2014 | Interest Charges | 41.73 | 1014 | CHRG | 2104 | 141007 | 1999.22 |
| 10/7/2014 | Credit Unemployment Premium | 6.81 | 1014 | CHRG | 2104 | 141007 | 1957.49 |
| 10/7/2014 | Credit Disability Premium | 4 | 1014 | CHRG | 2104 | 141007 | 1950.68 |
| 10/7/2014 | Credit Property Premium | 3.7 | 1014 | CHRG | 2104 | 141007 | 1946.68 |
| 10/7/2014 | Credit Life Premium | 2.4 | 1014 | CHRG | 2104 | 141007 | 1942.98 |
| 10/7/2014 | Late Fee | 10 | 1014 | CHRG | 2104 | 140907 | 1940.58 |
| 10/6/2014 | Payment - Thank You | -120 | 9792 | | 4600 | 497 | 1930.58 |
| 9/7/2014 | Credit Unemployment Premium | 6.77 | 914 | CHRG | 2104 | 140907 | 2050.58 |
| 9/7/2014 | Credit Property Premium | 3.68 | 914 | CHRG | 2104 | 140907 | 2043.81 |
| 9/7/2014 | Credit Life Premium | 2.39 | 914 | CHRG | 2104 | 140907 | 2040.13 |
| 9/7/2014 | Interest Charges | 41.48 | 914 | CHRG | 2104 | 140907 | 2037.74 |
| 9/7/2014 | Credit Disability Premium | 3.98 | 914 | CHRG | 2104 | 140907 | 1996.26 |
| 8/7/2014 | Credit Disability Premium | 2.61 | 814 | CHRG | 2104 | 140807 | 1992.28 |
| 8/7/2014 | Credit Property Premium | 2.41 | 814 | CHRG | 2104 | 140807 | 1989.67 |
| 8/7/2014 | Credit Life Premium | 1.56 | 814 | CHRG | 2104 | 140807 | 1987.26 |
| 8/7/2014 | Credit Unemployment Premium | 4.43 | 814 | CHRG | 2104 | 140807 | 1985.7 |
| 7/25/2014 | PURCHASES | 1856.33 | 6511 | REG | 2945 | 6296 | 1981.27 |
| 7/25/2014 | Return of Merchandise | -1466.81 | 6511 | REG | 2945 | 6296 | 124.94 |
| 7/17/2014 | PURCHASES | 1591.75 | 6358 | REG | 2945 | 6185 | 1591.75 |

Halsted_00029

ST. LOUIS GALLERIA

2124 SAINT LOUIS GALLERIA

ST. LOUIS, MO 631170000

Date: 10/16/2015      Time: 14:18:07      Sales Slip ID: 24355

Cardholder:     TUKIN, BO
Account No:     XXXXXX1870
Purchase Price:    $1688.34
Down Payment:    $0.00
Credit Plan:      REG

YOU MAY RETURN YOUR PURCHASE WITHIN 60 DAYS OR EXCHANGE IT WITHIN 90 DAYS OF PURCHASE. WATCHES MAY BE EXCHANGED OR RETURNED WITHIN 30 DAYS IF IN ORIGINAL CONDITION (UNWORN & UNALTERED) AND WITH ORIGINAL PACKAGING, WARRANTY DOCUMENTS & INSTRUCTIONS. SPECIAL ORDERED WATCHES, CUSTOM DESIGNED MERCHANDISE, ITEMS ENGRAVED WITH PERSONALIZED INFO & CLASS RINGS CANNOT BE RETURNED OR EXCHANGED. MERCHANDISE RECEIVED VIA THE JEWELRY REPLACEMENT PLAN CANNOT BE RETURNED.

Total: $1688.34

Cardholder agrees to pay the above total according to card issuer agreement.

SECURITY AGREEMENT

I grant a security interest in these purchased goods pursuant to my KAY JEWELERS Retail Installment Charge Agreement, the terms of which are incorporated by reference.

```
                07/25/2014 17:29
```
Document #: 45-3 Filed: 07/25/22 Page 3
```
                2945-1-6511-006296
─────────────────────────────────────────
Cust Name: BO TUKIN
LO       N           PURCHASES/RETURNS
  Dpt Sku        Dsc      Retail       Sold
2 001 940258914 ADV     2099.00    -1416.82
PREMIUM              DISCOUNT       100.00
 14WG OS BRIDAL SET
 ORIG SALE 2945 071714 006185 N
 SLSPRSN 000443288 000222945
 REASON - Return (DL)
2 800 940258914           0.00     -149.99
 ORIG SALE 2945 071714 006185 N
 SLSPRSN 000443288 000222945
 REASON - Return (DL)
1 001 940244712 ADV     2599.00    1754.32
PREMIUM              DISCOUNT      -100.00
GUARANTEE #1602-4705
 14WG OS BRIDAL SET
SLSPRSN 000443288 000443288 000222945
        000222945
1 800 940244712           0.00      169.99
 ESP      1754.32
 ESP SP 000443288 000443288 000222945
        000222945
                         SUBTOT      357.50
           SALES TAX  9.4880         32.02
           TOTAL                     389.52
 PPP=Y  TOTAL DOWN PAYMENT            0.00
 PPP SP 000443288 000222945
# ******1870 REG  CREDIT PLAN        389.52
   CREDIT AUTHORIZATION AA000291
PROMO CARD REDEEMED #402A-0000001013
SLSPRSN 0004 Halsted 00031 5
```

```
Cust Name: BO TUKIN
FR      Y           PURCHASES/RETURNS
  Dpt Sku        Dsc     Retail      Sold
1 001 040738700 ADV     1199.00     999.99
MALL REWARDS DISCOUNT               279.72
GUARANTEE #9949-9899
 14WG ENHANCER
SLSPRSN 000219253 000213129 000352121
1 800 040738700          0.00       129.99
 ESP      999.99
 ESP SP 000219253 000213129 000352121
1 001 252315801 ADV      355.00     299.99
MALL REWARDS DISCOUNT                83.91
 Wedding Band
SLSPRSN 000219253 000213129 000352121
1 890 252315801          0.00        29.99
 JRP      299.99
 JRP SP 000219253 000213129 000352121
1 003 281910404 ADV      650.00     487.50
MALL REWARDS DISCOUNT               136.37
 CITIZEN WATCH
SLSPRSN 000219253 000213129 000352121
1 760 281910404          0.00       129.99
Ultimate Watch Warranty
UWP Warranty Number      7DDS3X4UZZ8G
SLSPRSN 000219253 000213129 000352121
                         SUBTOT    1577.45
            SALES TAX  8.6130       110.89
            TOTAL                  1688.34
 PPP=N   TOTAL DOWN PAYMENT          0.00
# ******1870 REG  CREDIT PLAN     1688.34
   CREDIT AUTHORIZATION VSY9091601
SLSPRSN 000219253 000213129 000352121
   MALL REWARDS REDEEMED
   ENABLE # Halsted_00032             500.00
```

St. Louis Premium Outlets

18511 Outlet Blvd. Suite #815

Chesterfield, MO 63005

Date: 07/25/2014          Time: 17:29:47          Sales Slip ID: 6296

Cardholder:        TUKIN, BO
Account No:        XXXXXX1870
Purchase Price:    $389.52
Down Payment:      $0.00
Credit Plan:       REG

YOU MAY RETURN YOUR PURCHASE WITHIN 60 DAYS OR EXCHANGE WITHIN 90 DAYS. WATCHES CAN BE EXCHANGED OR RETURNED WITHIN 30 DAYS, MUST BE UNWORN AND UNALTERED WITH ORIGINAL PACKAGING, INSTRUCTION, AND WARRANTY DOCUMENTS. CUSTOM DESIGNED JEWELRY AND SPECIAL ORDERED WATCHES CANNOT BE RETURNED OR EXCHANGED.

Total: $389.52

Cardholder agrees to pay the above total according to card issuer agreement.

SECURITY AGREEMENT

I grant a security interest in these purchased goods pursuant to my KAY OUTLET Retail Installment Charge Agreement, the terms of which are incorporated by reference.

KAY OUTLET

## Account Summary for BOB TUKIN

| Account Information as of 03/14/2019 | |
|---|---|
| Account Number | XXXXXX1870 |
| Billing Date | 10/11/2017 |
| Payment Due Date | 11/06/2017 |
| Past Due Amount | $1,810.00 |
| Minimum Monthly Payment | $140.00 |
| Total Due | $1,950.00 |
| Balance* | $3,315.20 |
| Available Credit | $0.00 |
| Last Payment Date | 09/13/2017 |
| Last Payment Amount | $150.00- |
| * Does not include transactions identified as pending. | |

| Customer Details |
|---|
| BOB V TUKIN
7037 PERNOD AVE
ST LOUIS, MO 63139
Home Phone: 314-566-8633
Work Phone: 100-021-5069 |

| Statements |
|---|
| You can view past statements here by selecting the desired month in the list below. |

| Payment Options |
|---|
| ▸ Pay Bill By Check |

| Activity Since Last Statement (from 10/11/2017 to 03/14/2019) | | | |
|---|---|---|---|
| Plan | Date | Description | Amount |
| | | | |

Close    Account Lookup

Halsted_00034

Thursday, March 14, 2019 06:23:49 PM EDT

# Halsted Financial Services, LLC

*P.O. Box 828, Skokie, IL 60076 - Tel: 855-221-9737 ext 701 - Web: www.halstedfinancial.com*
*Hours of Operation: M-TH 8am – 8pm / Fri-Sat 8am - 5pm*

## 30%
### off your balance

9/20/2019

| | |
|---|---|
| Our Reference Number: 21453558 | Original Creditor Account Number: XXXXXXXXXXXXX7925 |
| Balance Due: $3,407.84 | Current Creditor Account Number: ▇▇▇▇ 162 |
| Original Creditor: Sterling Jewelers, Inc. | Current Creditor To Whom The Debt Is Owed: CVI SGP Acquisition Trust |

Dear BOB V TUKIN,

Your account has been placed by CVI SGP Acquisition Trust with our agency for collections. Please contact us at 855-221-9737 ext 701. You do have options!

1) We are offering a compromise of $2,385.48 to resolve this debt. That's a savings of $1,022.36!

2) If you cannot take advantage of the above offer, we can offer you a compromise of $3,067.06 in three payments of $1,022.35, $1,022.35 and $1,022.36 over three consecutive months. That's a savings of $340.78!

This office is not obligated to renew these offers after 11/5/2019. Please call us at 855-221-9737 ext 701 or visit www.halstedfinancial.com/payment-portal/ to make a payment.

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose. Unless you notify this office within 30 days after receiving this notice that you dispute the validity of the debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request from this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of the original creditor, if different than the current creditor.

Sincerely,
Jonathan Volpert, Account Manager

All payments and correspondence must be mailed to PO Box 828 Skokie, IL 60076
Please see the following pages for additional notices

2726-SFHALF10-SM-OFR-03/23/18

---

**\*\*\* Please detach the lower portion and return with your payment \*\*\***

Y241707A82

PO Box 505
Linden MI 48451-0505
ADDRESS SERVICE REQUESTED

Our Reference Number: 21453558
Balance Due: $3,407.84
**Discount Offer: $2,385.48**

9/20/2019

0008120024012989686163139211937—Y241707A82 2726
BOB V TUKIN
▇▇▇▇▇▇ AVE
SAINT LOUIS MO 63139-2119

**MAKE CHECKS PAYABLE AND SEND TO**

Halsted Financial Services, LLC
PO BOX 828
Skokie IL 60076-0828

Halsted_00035

Halsted_00036

## PRIVACY NOTICE

This Privacy Notice is being provided on behalf of each of the following related companies (collectively, the "Owners"). It describes the general policy of the Owners regarding the personal information of customers and former customers.

CVI SGP-CO Acquisition Trust                CVI SGP Acquisition Trust

**Information We May Collect.** The Owners may collect the following personal information: (1) information that we receive from your account file at the time we purchase your account, such as your name, address, social security number, and assets; (2) information that you may give us through discussion with you, or that we may obtain through your transactions with us, such as your income and payment history; (3) information that we receive from consumer reporting agencies, such as your creditworthiness and credit history, and (4) information that we obtain from other third party information providers, such as public records and databases that contain publicly available data about you, such as bankruptcy and mortgage filings. All of the personal information that we collect is referred to in this notice as "collected information".

**Confidentiality and Security of Collected Information.** As the Owners, we restrict access to collected information about you to individuals who need to know such collected information in order to perform certain services in connection with your account. We maintain physical safeguards (like restricted access), electronic safeguards, and procedural safeguards (such as authentication procedures) to protect collected information about you.

**Sharing Collected Information with Affiliates** From time to time, the Owners may share collected information about customers and former customers with each other in connection with administering and collecting accounts to the extent permitted under applicable law.

**Sharing Collected Information with Third Parties** The Owners do not share collected information about customers or former customers with third parties, except as permitted under applicable law.

Halsted_00038



In consideration of the payment of the premium, the Insurer and the **Insureds** agree as follows:

**I.    PREAMBLE**

The insurance coverages offered in this Policy are part of a portfolio of insurance coverages, consisting of this General Terms and Conditions ("GTC") and any individual **Liability Coverage Parts** and **Non-Liability Coverage Parts** purchased, as stated in Item 4 of the Declarations of this GTC. The type of coverage provided by each of the **Liability Coverage Parts** and **Non-Liability Coverage Parts** are identified in each particular Coverage Part. Unless expressly stated to the contrary, the terms, conditions and limitations in this GTC apply to the entire Policy, whereas the terms, conditions and limitations of each individual Coverage Part only apply to that particular Coverage Part. In the event of a conflict between any terms, conditions or limitations of the GTC and any terms, conditions and limitations of any individual Coverage Part, the terms, conditions and limitations of the individual Coverage Part shall control.

**II.   EXCLUSIONS**

No coverage shall be provided under any **Liability Coverage Part** for **Loss** on account of that portion of a **Claim**:

A.   Bodily Injury/Property Damage - for bodily injury, mental anguish, emotional distress, humiliation, sickness, disease or death of any person or damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is damaged or destroyed;

B.   Conduct - based upon, arising out of or resulting from any deliberate fraud, deliberate criminal act or deliberate violation of any statute or regulation, or any illegal profit or remuneration, by an **Insured**, established by a final, non-appealable adjudication adverse to such **Insured** in any underlying action, and the Insurer shall not utilize a declaratory action or proceeding brought by or against the Insurer to establish such final, non-appealable adjudication;

C.   ERISA - for any violation of the responsibilities, obligations or duties imposed by **ERISA** or for any functions identified in **ERISA** Section 3(21)(A) as not being the functions of a fiduciary, and commonly referred to as "settlor" functions;

D.   Pending or Prior Proceedings - based upon, arising out of or resulting from an action, proceeding or **Claim** commenced against an **Insured** pending on or prior to the Pending or Prior Proceedings Date stated in the Declarations of each applicable **Liability Coverage Part**;

E.   Pollution - based upon, arising out of or resulting from any:

1.   discharge, emission, release, dispersal or escape of any **Pollutants** or any threat thereof;

2.   treatment, removal or disposal of any **Pollutants**; or

3.   regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**,

including any **Claim** for financial loss to a **Company**, its securityholders or its creditors based upon, arising from or in consequence of any matter described in paragraphs 1, 2, or 3 above;

F.   Prior Notice - based upon, arising out of or resulting from any claim reported, or any circumstance reported and accepted, under the insurance policy (including any policies of which such policy is a renewal policy) replaced by this Policy; and

G.   Wage and Hour - based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by any law governing wage, hour or payroll, including the Fair Labor Standards Act;

Exclusions D and F above shall not apply where this Policy is a renewal of a policy issued by the Insurer to the **Parent Company**.

With respect to all Policy exclusions, no conduct or knowledge of any **Insured** shall be imputed to any other **Insured Person**, and solely with respect to Exclusion B, only the conduct or knowledge of any past, present or future chief executive officer or chief financial officer of a **Company** shall be imputed to such **Company** and its **Subsidiaries**.

**III.   RETENTION OR DEDUCTIBLE**

A.   Any Retention or Deductible applicable to any Coverage Part shall apply as set forth in each Coverage Part and in the amount(s) stated in the Declarations of each Coverage Part. If different parts of a single **Claim** are

Halsted_00039

subject to different Retentions or Deductibles, then the total amount of **Loss** applied to the applicable Retentions or Deductibles shall not exceed the largest applicable Retention or Deductible.

B. No Retention shall apply to any **Loss** for which an **Insured Person** is not indemnified by a **Company** because of such **Company's Financial Impairment**.

## IV. LIMIT OF LIABILITY

A. The Combined Maximum Aggregate Limit of Liability, stated in Item 3 of the Declarations of this GTC, represents the maximum amount payable under all **Liability Coverage Parts** during the **Policy Period** for all **Liability Coverage Parts** combined.

B. The Limit of Liability, stated in Item 2 of the Declarations of each **Liability Coverage Part**, represents the maximum amount payable under each **Liability Coverage Part** during the **Policy Period** for any one **Claim** and in the aggregate as set forth in each such **Liability Coverage Part**.

C. **Defense Costs** are part of, and not in addition to, the Limit of Liability of each **Liability Coverage Part**.

D. The remaining portion of each of the limits of liability described above shall be the limits of liability available during any Extended Reporting Period applicable to any Coverage Part.

## V. REPORTING

A. Notice of any **Claim** under any **Liability Coverage Part** is considered timely when reported to the Insurer as soon as practicable after the **Parent Company's** chief executive officer or chief financial officer first becomes aware of such **Claim**. The Insurer shall not assert that notice of a **Claim** was untimely unless the Insurer is materially prejudiced by the untimely notice. However, in no event shall any notice be provided later than:

1. if the applicable **Liability Coverage Part** expires (or is otherwise terminated) without being renewed with the Insurer, 60 days after the effective date of such expiration or termination; or

2. the expiration date of the Extended Reporting Period, if applicable.

B. Notice requirements involving any **Non-Liability Coverage Part** shall be in accordance with the reporting requirements set forth in such **Non-Liability Coverage Part**.

C. Notice of any circumstance which could give rise to a **Claim** under any **Liability Coverage Part** is optional. If an **Insured** elects to report any circumstance which could give rise to a **Claim**:

1. such notice shall include information regarding the nature of any **Wrongful Acts** or alleged or potential damages and the names of any actual or potential defendants; and

2. any **Claim** that may subsequently arise out of a reported circumstance shall be deemed to have been first made during the **Policy Period** in which such circumstance was first reported.

## VI. DEFENSE AND SETTLEMENT

A. With respect to any **Claim** under any **Liability Coverage Part**, the Insurer shall have the right and duty to defend any **Claim**, unless otherwise specifically stated in a particular **Liability Coverage Part**. The Insurer shall have such right and duty to defend even if any of the allegations in such **Claim** are groundless, false or fraudulent. Any such duty to defend shall cease upon exhaustion of the applicable Limit of Liability.

B. With respect to any **Claim** under any **Liability Coverage Part**:

1. the **Insured** shall:

(a) not agree to any settlement, stipulate to any judgment, incur any **Defense Costs**, admit any liability or assume any contractual obligation, without the Insurer's prior written consent, provided that, unless otherwise stated in a particular **Liability Coverage Part**, the **Insured** may settle any **Claim**, without the Insurer's prior written consent, where the amount of such settlement, including **Defense Costs**, does not exceed the applicable Retention or Deductible;

(b) not do anything that could prejudice the Insurer's position or its potential or actual rights of recovery; and

(c) agree to provide the Insurer with all information, assistance and cooperation which the Insurer may reasonably require,

provided that the failure of any **Insured** to comply with any of the requirements in paragraphs (a) - (c) above, shall not impair the rights of any **Insured Person** under this Policy; and

2. the Insurer:

Halsted_00040

(a) may make any investigation it deems reasonably necessary and may, with the consent of the **Insureds**, make any settlement of any **Claim** it deems appropriate; and

(b) shall not be liable for any such settlement, stipulation, incurred **Defense Costs**, admission or assumed obligation to which it has not given its prior written consent, and the Insurer shall not unreasonably withhold such consent.

## VII. ALLOCATION

If in any **Claim**, the **Insureds** who are afforded coverage for a **Claim** incur **Loss** that is covered by this Policy and loss that is not covered by this Policy because such **Claim** includes both covered and uncovered matters, 100% of **Defense Costs** incurred by such **Insured** shall be covered **Loss**, and all loss other than **Defense Costs** shall be allocated between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to such matters.

## VIII. TREATMENT OF RELATED CLAIMS

All **Related Claims** shall be deemed a single **Claim** first made during the policy period in which the earliest of such **Related Claims** was either first made or deemed to have been first made in accordance with Section V. REPORTING above.

## IX. SUBROGATION

A. In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery, and the **Insureds** shall take all reasonable actions to secure and preserve the Insurer's subrogation rights.

B. In no event shall the Insurer exercise any subrogation right against an **Insured Person**. In any subrogation action against a **Company**, it is agreed that each **Company** agrees to fulfill any indemnification obligations to the fullest extent permitted by law and any contract or agreement providing an indemnification obligation exceeding any such law.

C. If the Insurer recovers, either through subrogation or recoupment, any portion of an amount paid under this Policy, the Insurer shall reinstate the applicable limit of liability with any amounts recovered up to such amount paid, less any costs incurred by the Insurer in its recovery efforts.

## X. EXTENDED REPORTING PERIOD

With respect to all **Liability Coverage Parts**:

A. If this Policy does not renew, or terminates other than for non-payment of premium, the **Insureds** shall have the right to purchase an ERP for the premium and time period stated in Item 6 of the Declarations. In the event of the non-renewal or termination of one or more **Liability Coverage Parts** of this Policy, the **Insureds** may purchase an ERP solely as respects the **Liability Coverage Part(s)** that has been non-renewed or terminated.

B. The right to an ERP shall lapse unless written notice of election to purchase such ERP, together with payment of the specified premium, is received by the Insurer within 30 days after the effective date of non-renewal or termination of the Policy. In the event the **Parent Company** elects not to purchase an ERP and an individual **Insured** or group of **Insureds** elects to purchase such ERP, such ERP shall only apply to **Claims** against such **Insured** or group of **Insureds**.

C. The premium for the ERP shall be deemed fully earned at the inception of the ERP.

D. Any ERP purchased shall become part of the **Policy Period**, extending such **Policy Period** to the expiration of the time period stated in Item 6 of the Declarations, but only with respect to **Loss** on account of a **Claim** for a **Wrongful Act** taking place before the effective date of non-renewal or termination.

## XI. CHANGES IN EXPOSURE

A. New Companies and Old Companies

This Policy's treatment of **Subsidiaries** shall be as stated below and as supplemented by any individual Coverage Part.

Any **Insured** of a **Subsidiary**:

1. acquired before or during the **Policy Period** is eligible for coverage under any:

(a) **Liability Coverage Part**, but only for **Loss** on account of a **Claim** for a **Wrongful Act** which occurs after the date of such acquisition; and

      (b) **Non-Liability Coverage Part**, but only after the effective date of such acquisition, and with respect to the Crime Coverage Part, subject to Section VIII. Other Insurance of such Coverage Part.

  2. ceasing to be a **Subsidiary** before or during the **Policy Period** is eligible for coverage under any:

      (a) **Liability Coverage Part**, but only for **Loss** on account of a **Claim** for a **Wrongful Act** which occurs while such entity was a **Subsidiary**; and

      (b) **Non-Liability Coverage Part**, as provided in such **Non-Liability Coverage Part**, but such **Subsidiary** and its **Insureds** shall cease to be **Insureds** under such **Non-Liability Coverage Part** as of the date of such cessation.

B. Acquisition of the **Parent Company**

In the event of a **Change in Control** of the **Parent Company** during the **Policy Period**:

  1. any **Liability Coverage Part** shall remain in force until the expiration of the **Policy Period**, but only for any **Claim** for a **Wrongful Act** which occurs prior to such acquisition;

  2. the entire premium for this Policy shall be deemed fully earned as of the effective date of such **Change in Control**; and

  3. the **Parent Company** shall be entitled to receive a quote for an extension of the **Liability Coverage Parts** ("Run-Off Coverage") solely for **Claims** for **Wrongful Acts** which occurred prior to a **Change in Control**. Coverage offered pursuant to such quote shall be subject to additional or different terms and conditions and payment of additional premium. Any Run-Off Coverage purchased shall replace any Extended Reporting Period provided under Section X. EXTENDED REPORTING PERIOD.

## XII. NOTICE

A. All notices to the Insurer under this Policy of any event, loss, **Claim** or circumstances which could give rise to a **Claim** shall be given in writing to the address listed in Item 5A of the Declarations, and any such notice shall be deemed notice under the Policy in its entirety.

B. All other notices to the Insurer under this Policy shall be given in writing to the address listed in Item 5B of the Declarations.

C. Any notice under this Policy shall be effective on the date of mailing or receipt by the Insurer, whichever is earlier.

## XIII. TERMINATION OF POLICY

This Policy shall terminate at the earliest of:

A. 20 days after receipt by the **Parent Company** of written notice from the Insurer of termination for non-payment of premium;

B. expiration of the **Policy Period**; or

C. surrender of the Policy to the Insurer by the **Parent Company** or notice to the Insurer by the **Parent Company** stating when such cancellation will take effect, and in either case any returned premium shall be computed on a pro rata basis.

## XIV. REPRESENTATIONS, SEVERABILITY AND NON-RESCINDABLE COVERAGE

A. In issuing this Policy, the Insurer has relied upon the information and representations in the **Application** as being true and accurate, and the **Application** is the basis for, and considered incorporated into, this Policy.

B. The **Application** shall be construed as a separate request for coverage by each **Insured**, without any knowledge possessed by an **Insured** being imputed to any other **Insured Person**.

C. If the **Application** contains any misrepresentation made with the actual intent to deceive or which, for reasons other than simple negligence or oversight, materially affect the Insurer's acceptance of the risk or the hazard assumed, the Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising out of or resulting from either of such misrepresentations:

  1. with respect to any **Insured Person** who had actual knowledge of any misrepresentation described in paragraph C above, and the Insurer can demonstrate that with such actual knowledge, such **Insured Person** reasonably believed that a **Claim** would arise from such misrepresentation;

  2. with respect to any **Company**, if the **Insured Person** described in paragraph 1 above is a past or present chief executive officer or chief financial officer of the **Parent Company**.

D. The Insurer shall not be entitled under any circumstances to void or rescind this Policy with respect to any **Insured**.

## XV. EFFECT OF BANKRUPTCY

Bankruptcy or insolvency of any **Insured** shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights or defenses under this Policy.

## XVI. WORLDWIDE TERRITORY

This Policy shall apply anywhere in the world, and any reference to laws, however described, shall include all U.S. federal, state and local statutory laws, all amendments to and rules and regulations promulgated under any such laws, common law, and any equivalent body of law anywhere in the world, unless specifically stated to the contrary.

## XVII. ROLE OF THE PARENT COMPANY

The **Parent Company** shall act on behalf of each **Insured** with respect to paying premiums, receiving any return premiums, agreeing to endorsements to this Policy and the giving or receiving of any notice provided for in this Policy (except notices of a **Claim** or circumstance which could give rise to a **Claim** or notice to apply for an ERP).

## XVIII. VALUATION AND FOREIGN CURRENCY

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If any element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the exchange rate published in The Wall Street Journal on the date the element of **Loss** is due.

## XIX. ALTERATION, ASSIGNMENT AND HEADINGS

A. Any change in or modification of this Policy or assignment of interest under this Policy must be agreed to in writing by the Insurer.

B. The descriptions and headings and sub-headings of this Policy are solely for convenience, and form no part of the terms, conditions and limitations of coverage.

## XX. ESTATES, HEIRS, LEGAL REPRESENTATIVES, ASSIGNS, SPOUSES AND DOMESTIC PARTNERS

With respect to any **Liability Coverage Part**, **Insured Person** shall include:

A. the estate, heirs, legal representatives or assigns of any **Executive**, if such **Executive** is deceased, legally incompetent, insolvent or bankrupt; and

B. the lawful spouse or domestic partner of any **Executive** solely by reason of such spouse's or domestic partner's: 1. status as such; or 2. ownership interest in property which a claimant seeks as recovery for an alleged **Wrongful Act** of such **Executive**,

provided that no coverage shall apply with respect to loss arising from an act, error or omission by any estate, heir, legal representative, assign, spouse or domestic partner of an **Insured Person**.

## XXI. TRADE SANCTIONS

This insurance coverage does not apply to the extent that trade or economic sanctions of any country prohibit the insurer or any member of the insurer's group from providing insurance coverage.

## XXII. GLOSSARY

The following terms shall have the meaning ascribed to such terms in each applicable Coverage Part: **Claim**, **Defense Costs**, **Insured**, **Insured Person**, **Loss** and **Wrongful Act**.

A. **Application** means where provided to the Insurer, the application and any accompanying documentation submitted to the Insurer for this Policy or any documentation submitted to the Insurer in connection with the underwriting of this Policy.

B. **Change in Control** means:

1. the **Parent Company's** merger with, or acquisition by, another entity or the acquisition of all or substantially all of its assets by another entity, such that the **Parent Company** is not the surviving entity; or

2. when a person or entity or group of persons or entities acting in concert, acquires securities or voting rights which result in ownership or voting control by such person(s) or entity(ies) of more than 50% of the

Halsted_00043

outstanding securities or voting rights representing the present right to vote for or appoint directors or **Managers** of the **Parent Company**.

C. **Company** means the **Parent Company** and any **Subsidiary**, any foundation, political action committee or charitable trust controlled or sponsored by the **Parent Company** or any **Subsidiary**, and the **Parent Company** or any **Subsidiary** in its capacity as a debtor in possession under United States bankruptcy law.

D. **Employee** means any natural person whose labor or service was, is or will be engaged and directed by a **Company**, including a part-time, seasonal, leased and temporary employee, intern or volunteer. **Employee** does not include an independent contractor.

E. **ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA")).

F. **Executive** means any natural person who was, now is or shall become:

1. a duly elected or appointed director, officer, **Manager**, trustee, regent, governor, risk manager, comptroller or in-house general counsel of any **Company** organized in the United States of America, or in a functionally equivalent or comparable role to any of the foregoing; or

2. a holder of a functionally equivalent position or comparable role to those described in paragraph 1 above in a **Company** that is organized in a jurisdiction other than the United States of America, including any position on an advisory board or committee.

G. **Extradition** means any formal process by which an **Insured** located in any country is or is sought to be surrendered to any other country for trial or otherwise to answer any criminal accusation, including the execution of an arrest warrant where such execution is an element of such process.

H. **Financial Impairment** means the status of a **Company** resulting from: 1. the appointment by a state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate such **Company**; or 2. such **Company** becoming a debtor in possession under United States bankruptcy law.

I. **Liability Coverage Part** means any Coverage Part identified in this Policy as a "Liability Coverage Part" within the heading to such Coverage Part or providing third party liability coverage in such Coverage Part.

J. **Manager** means any natural person, who was, now is, or shall become, a manager, member of the Board of Managers or equivalent executive of a **Company** that is a limited liability company.

K. **Non-Liability Coverage Part** means any Coverage Part or insuring clause in this Policy that does not provide any third party liability coverage.

L. **Parent Company** means the entity named in Item 1 of the Declarations.

M. **Policy Period** means the period of time stated in Item 2 of the Declarations of this GTC (subject to any termination in accordance with Section XIII. TERMINATION OF POLICY) and the ERP, if applicable.

N. **Pollutants** means any solid, liquid, gaseous or thermal irritants or contaminants, including smoke, soot, vapor, fumes, acids, chemicals, alkalis, asbestos, asbestos products or waste. Waste includes materials to be reconditioned, recycled or reclaimed.

O. **Related Claims** means all **Claims** based upon, arising out of or resulting from the same or related, or having a common nexus of, facts, circumstances or **Wrongful Acts**.

P. **Subsidiary** means:

1. any entity while more than 50% of the outstanding securities or other equity ownership, representing the present right to vote for election of, or to appoint, directors, **Managers**, or the foreign equivalent of any such directors or **Managers** of such entity, are owned or controlled by the **Parent Company** directly or indirectly through one or more **Subsidiaries**; or

2. any entity while the **Parent Company** has the right, pursuant to either written contract or the bylaws, charter, operating agreement or similar documents of a **Company**, to elect or appoint a majority of the Board of Directors of a corporation or **Managers**.

Halsted_00044

**POLICY NUMBER: ADC01741-02**



*The Solution* for Errors and Omissions Liability
Coverage Part Declarations

**QBE Insurance Corporation**
55 Water Street, New York, New York 10041
Home Office: c/o CT Corporation System, 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101

**CERTAIN COVERAGE SUB-PARTS PROVIDE CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

**Item 1**: Parent Company: HALSTED FINANCIAL SERVICES, LLC

**Item 2**: Limits of Liability, Retentions and Retroactive Dates:

| Coverage Sub-Part | | Limit of Liability | Retention | Retroactive Date |
|---|---|---|---|---|
| A. | Miscellaneous Professional Services | $2,000,000 any one Claim $2,000,000 in the aggregate | $5,000 per Claim | February 1, 2011 |
| B. | Technology | N/A | N/A | N/A |
| C. | Media Claims Made | N/A | N/A | N/A |
| D. | Media Occurrence | N/A | N/A | N/A |

**Item 3**: Errors and Omissions Combined Aggregate Limit of Liability: $2,000,000

**Item 4**: Pending or Prior Proceedings Date: February 1, 2016

Halsted_00045



*The Solution* for Errors and Omissions Liability
**Coverage Part**

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the **Insureds** agree as follows:

## I. INSURING CLAUSE

The Insurer shall pay, on behalf of an **Insured**, **Loss** on account of a **Claim** first made during the **Policy Period**.

## II. EXCLUSIONS

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for **Loss** on account of that portion of a **Claim**:

A. Antitrust - based upon, arising out of or resulting from anti-trust, price fixing or discrimination, restraint of trade, monopolization, unfair trade practices or predatory pricing;

B. Contract - for any liability in connection with any contract, agreement, warranty or guarantee to which an **Insured** is a party, provided that this Exclusion B shall not apply to **Loss** to the extent that such **Insured** would have been liable for such **Loss** in the absence of such contract, agreement, warranty or guarantee;

C. Electronic Funds Transfer - based upon, arising out of or resulting from the transfer of any fund, money or security;

D. Employment Practices - based upon, arising out of or resulting from any employment-related **Wrongful Act**;

E. False Advertising - based upon, arising out of or resulting from intentionally false or deceptive advertising;

F. Games of Chance - based upon, arising out of or resulting from any gambling, contest, lottery, sweepstake, coupon, promotional game, or other game of chance, including any redemption in connection therewith;

G. Government and Licensing - based upon, arising out of or resulting from any action brought by or on behalf of the Federal Trade Commission ("FTC"), the Federal Communications Commission ("FCC"), the Securities and Exchange Commission ("SEC") or any other federal, state or local government agency, or The American Society of Composers, Authors and Publishers ("ASCAP"), Broadcast Music, Inc. ("BMI"), The Recording Industry Association of America ("RIAA"), The Society of European Stage Authors and Composers ("SESAC") or other licensing or rights organizations, in any such organization's regulatory, quasi-regulatory, or official capacity, function or duty;

H. Infrastructure Failure - based upon, arising out of or resulting from any electrical or mechanical failure or interruption, including any electrical disturbance, surge, spike, brownout or blackout, and any outage to gas, water, telephone, cable, satellite, telecommunications or other infrastructure;

I. Insured v. Insured - brought by, or on behalf of:

   1. an **Insured**, in any capacity, against any other **Insured**; or

   2. any entity: (a) that is either controlled, managed or operated, directly or indirectly, in whole or in part, by an **Insured**; or (b) in which an **Insured** possesses an ownership interest of at least 10%, where such entity is a publicly traded company, or 30% where such entity is a privately held company;

J. Intellectual Property - based upon, arising out of or resulting from any infringement of copyright, patent, trademark, trade dress, trade name or service mark or any misappropriation of ideas, trade secrets or other intellectual property rights;

K. Prior Knowledge - based upon, arising out of or resulting from any **Wrongful Act** committed prior to the **First Inception Date**, if, on or before such date, any **Insured** knew or could reasonably have foreseen that such **Wrongful Act** would result in a **Claim**; and

L. Privacy and Network Security Events - based upon, arising out of or resulting from a **Network Security Event** or **Privacy Event**.

With respect to this Coverage Part, Exclusion E. Pollution of Section II. EXCLUSIONS of the GTC includes **Biological Agents** in addition to **Pollutants**.

## III. LIMIT OF LIABILITY

The Errors and Omissions Combined Aggregate Limit of Liability stated in Item 3 of the Declarations of this Coverage Part represents the maximum amount payable for all **Loss** under this Coverage Part during the **Policy Period** for all Coverage Sub-Parts combined.

Halsted_00046

## IV.  OTHER INSURANCE

With the exception of insurance which is written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for **Loss** for which this Coverage Part provides coverage, provided that any payment by an **Insured** of a retention or deductible under any such other insurance shall reduce the Retention under this Coverage Part by the amount of such payment which would otherwise have been **Loss** under this Coverage Part.

## V.  GLOSSARY

A.  **Biological Agent** means any bacteria, mildew, mold, fungi, spore or other micro-organisms or mycotoxins and any of their associated toxins or any virus or other pathogen (whether or not a micro-organism).

B.  **Claim** means any:

1.  written demand for monetary or non-monetary (including injunctive) relief, including a demand for arbitration, mediation or waiving or tolling of a statute of limitations; and

2.  civil proceeding, evidenced by the service of a complaint or similar pleading;

against an **Insured** for a **Wrongful Act**, including any appeal therefrom.

The time when a **Claim** shall be deemed first made for the purposes of this Coverage Part shall be the date on which the **Claim** is first made against, served upon or received by the **Insured**.

C.  **Computer System** means computer software, middleware, firmware, hardware, applications, tools, programs, codes, scripts, websites, associated call centers, and the data stored thereon, as well as associated input and output devices, data storage devices, networking equipment, storage area network, or other electronic data backup facilities:

1.  leased, owned or operated by an **Insured**;

2.  operated for the benefit of an **Insured** by a **Service Provider**; or

3.  licensed to an **Insured**.

D.  **Corporate Information** means proprietary or confidential corporate information in any format that cannot be lawfully obtained or known by the general public, including customer lists, trade secrets and financial information that are provided to an **Insured** by a third party.

E.  **Defense Costs** means that part of **Loss** consisting of:

1.  reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any **Insured**) incurred in investigating, defending, opposing or appealing any **Claim**; or

2.  the premium for appeal, attachment or similar bonds (but the Insurer shall be under no obligation to furnish any bond).

F.  **Electronic Data** means any data, text, sounds, images or similar matter, including **Corporate Information** and **Personal Information** that exists on a **Computer System**, and that is subject to scheduled back-up procedures and security protections.

G.  **First Inception Date** means the inception date of the first Errors and Omissions Liability Coverage Part and applicable Coverage Sub-Part issued to the **Parent Company** by the Insurer.

H.  **Independent Contractor** means any natural person working for a **Company** pursuant to a written contract or agreement between such natural person and the **Company** which specifies the terms of the **Company's** engagement of such natural person.

I.  **Insured** means any **Company** or **Insured Person**.

J.  **Insured Person** means any:

1.  **Executive** or **Employee**; or

2.  **Independent Contractor**, but only if the **Company** agrees to indemnify the **Independent Contractor** in the same manner as an **Employee** for liability arising out of a **Claim**.

K.  **Loss** means the amount that an **Insured** becomes legally obligated to pay on account of any **Claim** including:

1.  compensatory damages;

2.  judgments and settlements;

3.  pre and post-judgment interest;

4. **Defense Costs**; and

5. punitive, exemplary or multiplied damages, if and to the extent that any such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages.

In determining the most favorable jurisdiction as set forth in paragraph 5 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant **Insureds**, to the **Company**, or to the **Claim** giving rise to such damages, and the Insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the Insurer and the **Insured**) that such damages are insurable under applicable law.

**Loss** does not include any portion of such amount that constitutes any:

(a) amount not insurable under the law pursuant to which this Coverage Part is construed;

(b) cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c) liquidated damages, except to the extent that the amount of such damages is equal to the amount of **Loss** resulting from a **Wrongful Act**;

(d) return of any fee, charge, commission, gain or other compensation paid to an **Insured**;

(e) cost for an **Insured** to correct, re-perform or complete any **Professional Service**; or

(f) tax, fine or penalty imposed by law.

L. **Malicious Code** means the unauthorized corrupting of software, including but not limited to computer viruses, Trojan Horses, keystroke loggers, cookies, spyware, adware, worms and logic bombs, that successfully corrupts or impairs a **Computer System.**

M. **Network Security Event** means a breach of a **Computer System** that results in:

1. the theft, corruption or deletion of **Electronic Data** from a **Computer System**;

2. the **Unauthorized Access** to or **Unauthorized Use** of a **Computer System**;

3. the denial of an authorized user's access to a **Computer System**, unless such denial of access is caused by a mechanical or electrical failure outside the control of the **Insured**; or

4. the transmission of **Malicious Code** from a **Computer System**.

N. **Personal Information** means any information not available to the general public from which an individual may be identified, including an individual's name, telephone number, social security number, medical or healthcare data or other protected health information, driver's license number or state identification number, account number(s), bank account number(s), financial account information, retirement account number(s), healthcare account number(s), employee identification number(s), home address, credit information, government identification number(s), credit card number(s), access code or password that would permit access to that individual's account.

O. **Privacy Event** means: 1. the **Insured's** unintentional and unauthorized disclosure or loss of **Personal Information** or **Corporate Information** in the care, custody or control of any **Insured** or **Service Provider**; 2. unauthorized or surreptitious collection of **Personal Information** or **Corporate Information** by an **Insured** or the failure to provide adequate notice that such information is being collected; or 3. a violation of any **Privacy Regulation** or failure to comply with the **Insured's** own privacy policies.

P. **Professional Services** means **Miscellaneous Professional Services**, **Technology Services**, **Technology Products** and **Media Activities**, all of which shall mean as described in the applicable Coverage Sub-Part.

Q. **Retroactive Date** means the date, if any, stated in Item 2 of the Declarations of this Coverage Part.

R. **Service Provider** means a business the **Insured** does not own, operate or control, but that an **Insured** hires for a fee pursuant to a written contract to perform services related to an **Insured's** business.

S. **Unauthorized Access** means the gaining of access to a **Computer System** by an unauthorized person(s), or by an authorized person(s) in an unauthorized manner.

T. **Unauthorized Use** means the use of a **Computer System** by an unauthorized person(s), or by an authorized person(s) in an unauthorized manner.

U. **Wrongful Act** means as described in the applicable Coverage Sub-Part.



*The Solution* for Errors and Omissions -
Collection Professional Services
Coverage Sub-Part

In consideration of the payment of the premium and subject to the General Terms and Conditions and the Errors and Omissions Liability Coverage Part, the Insurer and the **Insureds** agree as follows:

I. **GLOSSARY**

A. **Client** means any recipient of **Professional Services.**

B. **Collection of Owned Debt** means the use of any instrumentality of interstate commerce or the mails in the collection or attempted collection of **Owned Debt.**

C. **Consumer means** any natural person or organization that is actually or allegedly obligated to pay any **Debt** or is the subject of any **Consumer Report.**

D. **Consumer Report** means any written, oral, or other communication of any information by a consumer reporting agency bearing on a **Consumer's** credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living.

E. **Consumer Reporting Agency Services** means the assembling or evaluating of **Consumer** credit information or other information on **Consumers** for the purpose of furnishing **Consumer Reports** to third parties, and which uses any means or facility of interstate commerce for the purpose or preparing or furnishing **Consumer Reports** for a fee, dues, or on a cooperative nonprofit basis.

F. **Debt** means any actual or alleged obligation of a **Consumer** to pay money whether or not such obligation has been reduced to judgment.

G. **Debt Collection Services** means the use of any instrumentality of interstate commerce or the mails in the collection or attempted collection of **Debt** that is not **Owned Debt**.

H. **Miscellaneous Professional Services** means the following:

**DEBT COLLECTION SERVICES; COLLECTION OF OWNED DEBIT**

I. **Owned Debt** means **Debt** that, through purchase or guarantee, is owned or acquired by any **Insured Person,** any **Company,** or any **Related Entity.**

J. **Related Entity** means any person or entity:

1. owned, operated or controlled by any **Insured**;

2. that owns, operates or controls any **Insured**;

3. affiliated with any **Insured** through common ownership or control; or

4. in which any **Insured** has at least 10% equity and is a partner, director or officer of such entity.

K. **Wrongful Act** means any error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted by an **Insured**, or by any other person or entity for which the **Insured** is legally liable, in the performance of or failure to perform **Miscellaneous Professional Services** on or after the **Retroactive Date** and prior to the end of the **Policy Period**.

II. Section **II. EXCLUSIONS** paragraphs A, C, E, F, G and H of the Errors and Omissions Liability Coverage Part are deleted.

III. Section **II. EXCLUSIONS** paragraph I. of the Errors and Omissions Liability Coverage Part is replaced by the following:

Insured v. Insured – brought by, or on behalf of, or in the name or right of, any **Insured**, **Client**, or any entity that at the time the **Wrongful Act** is committed, or the date the **Claim** is made:

a. is owned, operated, or controlled by any **Insured**;

b. owns, operates or controls any **Insured**; or

c. any **Insured** is a member of the board of directors, officer, member of the board of managers, partner or principal stockholder.

Halsted_00049

**IV.** Section **II. EXCLUSIONS** of the Errors and Omissions Liability Coverage Part is amended by the addition of the following:

Prescreening Services for Credit - based upon, arising out of or resulting from prescreening services for credit.

Failure to Remit or Collect Funds - based upon, arising out of or resulting from the failure to remit or collect funds.

Licensing – based upon or arising out of the failure of any **Insured** to obtain or maintain proper licenses or bonds, provided that this Exclusion will not apply to **Defense Costs**.

Title/Property Searches, Check Guarantee, Repossession - based upon, arising out of or resulting from:

1. title or property searches;

2. the guaranty of any check; or

3. repossessions by or on behalf of any **Insured**;

**V.** The definition of **Claim** in paragraph B. of Section **V. GLOSSARY** of the Errors and Omissions Liability Coverage Part is replaced by the following:

**Claim** means any:

1. written demand for monetary or non-monetary (including injunctive) relief, including a demand for arbitration, mediation or other alternative dispute resolution proceeding or waiving or tolling of a statute of limitations;

2. civil proceeding, evidenced by the service of a complaint or similar pleading; and

3. a formal administrative, regulatory or disciplinary proceeding, evidenced by the filing of a formal notice of charges, formal investigative order or service of summons, against an **Insured** for a **Wrongful Act**, including any appeal therefrom.

The time when a **Claim** shall be deemed first made for the purposes of this Coverage Part shall be the date on which the **Claim** is first made against, served upon or received by the **Insured**.

**VI.** The definition of **Insured** in paragraph I. of Section **V. GLOSSARY** of the Errors and Omissions Liability Coverage Part is amended by the addition of the following:

**Insured** also means any:

1. **Client** of the **Company**; provided that such **Client** is an **Insured** only for **Claims** resulting from an actual or alleged **Wrongful Act** committed solely by any **Insured** other than a **Client**; and

2. entity that is an owner of the **Company**; provided that such owner is an **Insured** only for **Claims** resulting from an actual or alleged **Wrongful Act** committed solely by any **Insured** other than an owner.

**VII.** Section **II. EXCLUSIONS**, paragraph A. of the GTC is replaced by the following:

A. **Bodily Injury/Property Damage** – for bodily injury, sickness, disease or death of any person or damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is damaged or destroyed;

Halsted_00050

POLICY NUMBER: ADC01741-02

QBBP-3012 (05-14)

 **QBE®**

*The Solution* for Crime
Coverage Part Declarations

**QBE Insurance Corporation**
Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office:  c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania  17101

**Item 1**:  Parent Company:  HALSTED FINANCIAL SERVICES, LLC

**Item 2**:  Limits of Liability and Retentions

| Insuring Clause | Limit of Liability | Retention |
|---|---|---|
| A.  Employee Theft | $1,000,000 | $10,000 |
| B.  In Transit | $25,000 | $500 |
| C.  Inside the Premises | $25,000 | $500 |
| D.  Forgery and Alteration | $25,000 | $500 |
| E.  Computer Fraud | $25,000 | $500 |
| F.  Funds Transfer Fraud Coverage | $25,000 | $500 |
| G.  Credit Card Fraud | $25,000 | $500 |
| H.  Money Orders and Counterfeit Currency Fraud | $10,000 | $500 |
| I.  Client Coverage | $1,000,000 | $10,000 |

**Item 3**:  Expense Limit  $10,000

**Item 4**:  Computer Fraud Expense Limit  $25,000

**Item 5**:  Information Reproduction Limit  $25,000

Halsted_00051



*The Solution* for Crime
Coverage Part

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the **Insureds** agree as follows:

## I.  INSURING CLAUSES

The Insurer shall pay the **Insured** for direct loss:

A.  Employee Theft

of **Money**, **Securities** or **Property** sustained by an **Insured** resulting from **Theft** or **Forgery** by an **Employee**, whether acting alone or in collusion with others.

B.  In Transit

sustained by an **Insured** resulting from:

1.  a **Third Party's**:

(a)  **Robbery** or other unlawful taking of **Money**, **Securities** or **Property**

(b)  damage to **Property** resulting from **Robbery**; and

2.  actual destruction or disappearance of **Money** or **Securities**,

while **In Transit** or temporarily in an **Employee's** or a partner of the **Company's** home.

C.  Inside the Premises

sustained by an **Insured** resulting from:

1.  a **Third Party's**

(a)  **Robbery** or **Safe Burglary**, including damage to **Property**, or **Premises** or its exterior, resulting from such **Robbery** or **Safe Burglary**;

(b)  unlawful taking of **Money**, **Securities** or **Property**; and

2.  actual destruction or disappearance of **Money** or **Securities**,

within or from the **Premises**.

D.  Forgery or Alteration

resulting from **Forgery** or alteration of any **Financial Instrument** by a **Third Party**, including any reasonable legal expenses that the **Insured** pays, with the Insurer's prior written consent, in defending any action brought against an **Insured** for refusing to pay such **Financial Instrument**, which any such amount shall be part of, and not in addition to, the Limit of Liability stated in Item 2 of the Declarations of this Coverage Part for this Insuring Clause D.

E.  Computer Fraud

of **Money**, **Securities** or **Property** resulting from  a **Third Party's Computer Fraud**, including any **Computer Fraud Expenses**.

F.  Funds Transfer Fraud Coverage

of **Money** or **Securities** resulting from a **Third Party's Funds Transfer Fraud**.

G.  Credit Card Fraud

resulting from a **Third Party's Credit Card Fraud** .

H.  Money Orders and Counterfeit Currency Fraud

resulting from a **Company's** good faith acceptance: 1. in exchange for merchandise, **Money** or services, of any post office or express money order, issued or purporting to have been issued by any post office or express company, if such money order is not paid upon presentation; or 2. in the regular course of business, of counterfeit paper currency.

Halsted_00052

I. Client Coverage

of **Money**, **Securities** or **Property** sustained by a **Client** resulting from an **Employee's Theft** or **Forgery** committed without collusion with a **Client's** employees.

## II. EXCLUSIONS

No coverage shall be available for:

A. Acts Committed by a Partner – loss based upon, arising out of or resulting from **Theft** or **Forgery** committed by a partner of a **Company**, whether acting alone or in collusion with others, provided that this Exclusion A shall not apply where the **Theft** or **Forgery** would otherwise be covered under Insuring Clauses A or I, and the coverage provided is excess of the amount of such partner's ownership percentage of such **Company** on the day immediately preceding the date of **Discovery**, multiplied by such **Company's** total assets as reflected in such **Company's** most recent financial statements; provided such statements have been audited or prepared by an independent Certified Public Accountant;

B. Advantage – loss sustained by one **Insured** to the advantage of another **Insured**;

C. Authorized Representative – loss or damage based on, arising out of or resulting from **Theft**, **Forgery**, **Funds Transfer Fraud**, **Computer Fraud**, **Credit Card Fraud** or other fraudulent, dishonest or criminal act (other than **Robbery** and **Safe Burglary**) committed by any authorized representative, except an **Independent Contractor**, of an **Insured**, acting alone or in collusion with others, provided that this Exclusion C shall not apply to loss under Insuring Clauses A or I where the **Theft** or **Forgery** is committed by an **Employee** acting in collusion with such authorized representative;

D. Custodial – loss of or damage to **Money**, **Securities** or **Property** in the custody of any bank, trust company or similar place of safe deposit, armored vehicle company, or any person duly organized by a **Company** to have custody of such **Money**, **Securities** or **Property**, provided that this Exclusion D shall not apply where coverage provided is excess of: 1. any amount recovered or received by the **Company** under any contract with, or any insurance available to, any of the foregoing; or 2. any other insurance or indemnity covering the loss, in whole or in part;

E. Data Costs, Fees, or Expenses – costs, fees or expenses incurred:

1. as a result of: (a) the reconstitution of **Data** where a **Company** knowingly used illegal copies of programs; (b) an alteration in **Data** held on magnetic media due to the effect of magnetic fields, their incorrect use or the obsolescence of the computer or its facilities; or (c) any effort to render the **Data** usable by replacement processing equipment; or

2. to design, improve or update software or programs or perfect their operation or performance;

F. Fire – loss based upon, arising out of or resulting from fire, provided that this Exclusion F shall not apply to: 1. loss of **Money** or **Securities**; or 2. damage to any safe or vault caused by fire for the purposes of **Safe Burglary**;

G. Income – loss of income, whether or not earned or accrued or potential income, not realized as the result of any loss covered under this Coverage Part;

H. Indirect or Consequential Loss – indirect or consequential loss of any kind, provided that this Exclusion H shall not apply to **Expenses**;

I. Intellectual Property – loss of trade secrets, confidential processing methods or other confidential information of any kind;

J. Inventory Shortage – loss, the proof of which is dependent solely on 1. a profit and loss computation or comparison; or 2. comparison of inventory records with an actual physical count, provided that where an **Employee** is involved and has been identified, inventory records and actual physical count of inventory can be submitted as supporting documentation of loss;

K. Legal Costs, Fees or Expenses – costs, fees or expenses incurred or paid in defending or prosecuting any legal proceeding or claim, provided that this Exclusion K shall not apply to **Expenses**;

L. Nuclear – loss or damage based upon, arising out of or resulting from nuclear reaction, nuclear radiation or radioactive contamination, or any act or condition related to any of the foregoing;

M. Trading Losses – loss based upon, arising out of or resulting from any trading of **Money**, **Securities** or

**Property**, provided that this Exclusion M shall not apply to direct loss caused by **Theft** or **Forgery** resulting in improper personal financial gains to an **Employee**. Improper personal financial gains does not include salaries, bonuses, commissions, fees, bonuses, promotions, awards, profit sharing or pensions;

N.  Voluntary Purchase or Exchange – loss based upon, arising out of, or resulting from an **Insured** knowingly giving or surrendering **Money**, **Securities** or **Property** in any purchase or exchange with a **Third Party** without collusion with an **Employee**, provided that this Exclusion N shall not apply to Insuring Clauses A, H or I;

O.  War and similar actions – loss or damage based upon, arising out of or resulting from war, whether or not declared, civil war, insurrection, rebellion or revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization or any act or condition related to any of the foregoing;

Exclusions P – Q below shall only apply to Insuring Clauses A. Employee Theft and I. Client Coverage:

P.  Broker/Independent Contractor – loss caused by any broker, commission, merchant, factor, consignee, contractor, independent contractor (other than an **Independent Contractor**) or other similar agent or representative;

Q.  Prior Dishonesty – loss caused by an **Employee**, which is sustained by an **Insured**:

    1. after an **Executive** or **Insurance Representative** becomes aware of a **Theft**, **Forgery** or other fraudulent, dishonest or criminal act:

        (a) valued at $1,000 or more and committed while in the employ or service of an **Insured**;

        (b) involving **Money**, **Securities** or other property, valued at $25,000 or more and committed prior to the employ or service of an **Insured**; or

    2. more than 90 days following termination of such **Employee**;

Exclusions R - S below shall only apply to Insuring Clauses B. In Transit and C. Inside the Premises:

R.  Mail/Carrier for Hire – loss of or damage to **Money**, **Securities** or **Property** while in the mail or in the custody of any carrier for hire other than an armored motor vehicle company

S.  Other Insuring Clauses - loss or damage based on, arising out of or resulting from **Forgery**, **Funds Transfer Fraud**, **Computer Fraud** or **Credit Card Fraud**;

Exclusion T. below shall only apply to Insuring Clauses B. In Transit, C. Inside the Premises, E. Computer Fraud and F. Funds Transfer Fraud Coverage:

T.  Kidnap, Ransom or Extortion – loss or damage based upon, arising out of or resulting from any kidnap, ransom or extortion payment;

Exclusion U. below shall only apply to Insuring Clause D. Forgery or Alteration:

U.  Forgery or Alteration – loss based upon, arising out of or resulting from  a **Third Party's Forgery** or alteration of: 1. any **Financial Instrument** committed in collusion with any **Employee**; or 2. any registered or coupon obligations of the **Insured**, or any coupons whether attached or detached; and

Exclusion V. below shall only apply to Insuring Clause G. Credit Card Fraud:

V.  Forgery or Alteration – loss based upon, arising out of or resulting from any forgery or alteration of, on or in any written instrument, provided that this Exclusion V shall not apply: 1. where there was full compliance with the provisions, conditions and other terms under which the involved credit card was issued; and 2. the **Company** is legally liable for the loss to the issuer of such credit card.

## III.  RETENTION

The Insurer shall not pay for any loss until that part of each loss exceeds the applicable Retention stated in Item 2 of the Declarations of this Coverage Part. No Retention shall apply to loss sustained by an **ERISA Plan**.

## IV.  LIMIT OF LIABILITY

A.  The Limits of Liability, stated in Item 2 of the Declarations of this Coverage Part, represent the maximum amount payable under each Insuring Clause for each loss **Discovered** during the **Policy Period**.

B.  The Expense Limit stated in Item 3 of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the **Policy Period** for **Expenses**, which amount shall be part of, and not in addition to, the Limits of Liability stated in Item 2 of such Declarations.

C.  The Computer Fraud Expense Limit stated in Item 4 of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the **Policy Period** for **Computer Fraud Expenses**, which amount shall be part of, and not in addition to, the Limit of Liability stated in Item 2 of such Declarations for Insuring Clause E. Computer Fraud.

D.  The Information Reproduction Limit stated in Item 5 of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the **Policy Period** for the cost of reproducing information contained in any lost or damaged manuscripts, records, accounts, microfilms, tapes or other

records resulting from a covered loss, which amount shall be part of, and not in addition to, the Limits of Liability stated in Item 2 of such Declarations.

E.    The Insurer shall not pay the **Insured** more for loss or losses sustained by more than one **Insured** then the amount the Insurer would pay if all loss or losses had been sustained by one **Insured**.

F.    All loss resulting from a single act or series of related acts of the same **Employee** or **Third Party**, and all loss whether such act or acts occurred before or during the **Policy Period**, shall be treated as a single loss subject to the Limits of Liability stated in Item 2 of the Declarations.

G.    If a loss is covered under more than one Insuring Clause, the maximum amount payable under this Coverage Part shall not exceed the largest applicable Limit of Liability of any such Insuring Clause.

## V.   DISCOVERY

A.    This Coverage Part provides coverage for loss sustained by an **Insured** at any time but **Discovered** during the **Policy Period**.

B.    The Insurer shall pay for loss that an **Insured** sustained prior to the effective date of expiration or termination of this Coverage Part, which is **Discovered** by the **Insured**:

1.    no later than 60 days after the effective date of such expiration or termination; and

2.    with respect to any **ERISA Plan**, no later than 1 year from the effective date of such expiration or termination.

This extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by the **Insured** to replace, in whole or in part, the insurance provided by this Coverage Part, regardless of whether such insurance provides coverage for loss sustained prior to its effective date.

## VI.   DUTIES IN THE EVENT OF LOSS

A.    An **Insured's** knowledge of any information relevant to this Coverage Part or **Discovery** shall be deemed knowledge possessed by all **Insureds**.

B.    Upon **Discovery**, the **Insured** shall:

1.    give written notice to the Insurer as soon as practicable, but in no event later than 90 days after such **Discovery**;

2.    provide the Insurer with a detailed, sworn proof of loss within 120 days after such **Discovery**;

3.    submit to an examination under oath at the Insurer's request;

4.    cooperate with the Insurer in the investigation and settlement of any claim.

## VII.   OWNERSHIP

Solely with respect to:

A.    Insuring Clauses A – H, this Coverage Part shall only apply:
1.    to **Money**, **Securities** or **Property** owned by a **Company,** for which the **Company** is legally liable, or held by the **Company** in any capacity, and
2.    no coverage shall be provided under this Coverage Part for any damage to the **Premises** unless the **Company** is the owner of such **Premises** or is legally liable for such damage;

provided that with respect to Insuring Clause A, the Insurer's liability shall not apply to **Money**, **Securities** or **Property** of a **Client**.

B.    Insuring Clause I, this Coverage Part shall only apply to **Money**, **Securities** or **Property** owned by a **Client**, which is held by a **Company** in any capacity or for which the **Company** is legally liable.

## VIII.  OTHER INSURANCE

With the exception of insurance which is written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for loss for which this Coverage Part provides coverage (including any prior insurance replaced by this Coverage Part, which provided a period of time to discover loss occurring prior to the termination or cancellation of such replaced policy), provided that any payment by an **Insured** of a retention or deductible under any such other insurance shall reduce the Retention under this Coverage Part by the amount of such payment which would otherwise have been loss under this Coverage Part.

Halsted_00055

**IX. ERISA PROVISION**

A. Any payment made by the Insurer under this Coverage Part for loss sustained by an **ERISA Plan** shall be paid to such **ERISA Plan**. If such loss payment is in excess of the amount of coverage required by **ERISA**, any such excess amount shall be held for the use and benefit of any other **ERISA Plan**, should such **ERISA Plan** also **Discover** loss covered under this Coverage Part.

B. With respect to each **ERISA Plan**, if covered loss is sustained by any **ERISA Plan**:

1. which does not have any employer securities, the Limit of Liability applicable to such covered loss shall be the greater of $1,000; or 10% of the **ERISA Plan's** funds handled as of the beginning of such **ERISA Plan's** fiscal year, up to a maximum limit of $500,000;

2. which does have any employer securities, the limit of liability applicable to such covered loss shall be the greater of $1,000; 10% of the **ERISA Plan's** funds handled as of the beginning of such **ERISA Plan's** fiscal year, up to a maximum limit of $1,000,000.

C. If the Limits of Liability stated in Item 2 of the Declarations of this Coverage Part are:

1. less than or equal to the amounts set forth in B1. and 2. above, then the applicable Limit of Liability shall be amended to such respective amounts; or

2. greater than the amounts set forth in B1. and 2. above, then the limit of liability for each **ERISA Plan** shall be the amounts stated above with the remaining limit allocated equally between all **ERISA Plans** sustaining loss.

**X. VALUATION**

The Insurer shall pay:

A. the actual market value of lost, damaged or destroyed **Securities** at the closing price of such **Securities** on the business day immediately preceding the day on which a loss is **Discovered**; or the cost of replacing **Securities**, whichever is less, plus the cost to post a Lost Instrument Bond;

B. the least of:
1. the actual cash value of the **Property**; or
2. the cost to repair or replace **Property**, other than precious metals, with that of similar quality and value,

at the time **Parent Company** complies with Section VI. DUTIES IN THE EVENT OF LOSS, regarding the furnishing of a proof of loss;

C. the United States of America dollar value of:
1. foreign currency based on the rate of exchange published in The Wall Street Journal on the day loss involving foreign currency is **Discovered**; or
2. any precious metals based on the amount published in The Wall Street Journal Cash Prices, Precious Metals, on the day loss involving such precious metals is **Discovered**.

**XI. GLOSSARY**

A. **Client** means a customer of a **Company** to whom a **Company** provides goods or services for a fee or with whom the **Company** has a written contract or agreement.

B. **Computer Fraud** means the unlawful taking of **Money**, **Securities** or **Property** resulting from an unauthorized:

1. entry into, change to or deletion of **Data** from a **Computer System**; or

2. introduction of instructions propagating through a **Computer System**,

directed solely against a **Company**.

C. **Computer Fraud Expenses** means reasonable costs, charges, fees and expenses (other than regular or overtime wages, salaries, fees or benefits of any **Company**) incurred by the **Company** to reproduce damaged or destroyed electronic **Data** computer programs or enable the **Company** to restore the **Company's Computer System** to the level of operational capability that existed immediately preceding the covered loss under Insuring Clause E.

D. **Computer System** means a computer or network of computers, including off-line media libraries.

E. **Credit Card Fraud** means the **Forgery** or alteration of, on or in, any written instrument required in connection with any credit card issued to a **Company** or at the request of a **Company**, to any **Executive** or **Employee** of a **Company.**

F.   **Data** means information contained in any records, manuscripts, accounts, microfilms or tapes processed and stored in a **Computer System**.

G.   **Discover**, **Discovered** or **Discovery** means knowledge acquired by an **Executive** or **Insurance Representative** which would cause a reasonable person to believe that that a covered loss or occurrence which could give rise to a covered loss has occurred, regardless of when the act(s) causing or contributing to such loss occurred or whether the exact amount or details of such loss are known.

    **Discover**, **Discovered** or **Discovery** shall not include knowledge acquired by an **Executive** or **Insurance Representative** acting alone or in collusion with an **Employee**, or knowledge possessed by any **Executive** or **Insurance Representative** who is a participant in the **Theft** or **Forgery**.

H.   **Employee** means any:

    1.   natural person who labor or service was, is or will be engaged and directed by a **Company**, including a part-time, seasonal, leased and temporary employee, intern or volunteer;

    2.   **Executive** while performing acts within the scope of the usual duties of an **Employee**;

    3.   **Independent Contractor**;

    4.   natural person fiduciary, trustee, administrator, employee as defined in paragraph 1 above or **Executive** of an **ERISA Plan** and any other natural person, who any of which handle **ERISA Plan** assets and are required by **ERISA** to be bonded by the **Company** in connection with such **ERISA Plan**;

    5.   former or retired employee described in paragraph 1 above or **Executive** retained as a consultant to the **Company**; or

    6.   employee described in paragraph 1 above or **Executive**, while on leave for military services.

I.   **ERISA Plan** means any welfare or pension plan as defined by **ERISA** and which is operated solely by a **Company** or jointly by a **Company** and a labor organization for the benefit of **Employees** and which existed on or before the inception of this Coverage Part or which is created or acquired after the inception of this Coverage Part. **ERISA Plan** shall not include any multi-employer plan.

J.   **Expenses** means reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any **Insured**): 1. incurred by the **Insured** to determine the amount and extent of loss covered under this Coverage Part; or 2. incurred and paid by the **Insured** to establish the existence, amount and preparation of the **Insured's** proof of loss in support of a covered loss under Insuring Clauses A – I.

K.   **Financial Instruments** means checks, drafts, promissory notices or similar written promises, orders or directions to pay a certain sum of **Money** that are:

    1.   made or drawn upon a **Company**; or

    2.   made or drawn by one acting as an **Insured's** agent and drawn on an **Insured's** account or that are purported to have been so made or drawn.

L.   **Forgery** means the signing, whether by hand, mechanically or electronically, of another natural person's name with intent to deceive.

M.   **Funds Transfer Fraud** means fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions (other than instructions which bear a **Forgery**), purportedly issued by a **Company**, to a financial institution directing the transfer, payment or delivery of **Money** or **Securities** from any of the **Company's** accounts at such institution, without such **Company's** knowledge or consent.

N.   **Independent Contractor** means any natural person working for a **Company** pursuant to a written contract or agreement between such natural person and the **Company** which specifies the terms of the **Company's** engagement of such natural person.

O.   **Insurance Representative** means an **Employee**, designated to represent an **Insured** for the purpose of effecting and maintaining insurance.

P.   **Insured** means any **Company** or **Sponsored Plan**.

Q.   **In Transit** means being conveyed by the **Company** outside the **Premises**, from one person or place to another, under the custody of an **Employee**, partner of a **Company** or another person duly authorized by such **Company** to have custody of **Money**, **Securities** or **Property**. The conveyance described in this paragraph begins immediately upon receipt of **Money**, **Securities** or **Property** by the person described herein and ceases immediately upon delivery to the designated recipient or its agent.

R.   **Money** means currency, coins, bank notes and bullion.

Halsted_00057

S.   **Premises** means the interior of that portion of: 1. any building that a **Company** occupies in conducting its business; or 2. that part of any building occupied by a bank, trust company or similar financial institution.

T.   **Property** means tangible property, other than **Money** or **Securities,** that has intrinsic value.

U.   **Robbery** means actual or attempted unlawful taking of **Money**, **Securities** or **Property** from the custody of an **Employee** or other person (except a person acting as a watchman, janitor or porter) duly authorized by a **Company** to have custody of **Money**, **Securities** or **Property**, by violence or threat of violence, committed in the presence and cognizance of such **Employee** or other person.

V.   **Safe Burglary** means: 1. the actual or attempted unlawful taking of **Money**, **Securities** or **Property** by forcible or violent entry evidenced by visible marks, from a locked vault or safe located within the **Premises** and any resultant damage to the safe or vault from such entry; or 2. damage to a locked safe, cash drawer, cash box or cash register by actual or attempted felonious entry or abstraction of such container.

W.   **Securities** means negotiable or non-negotiable instruments or contracts representing either **Money** or **Property**. **Securities** shall not include **Money**.

X.   **Sponsored Plan** means any **ERISA Plan** and any plan similar to an **ERISA Plan** that is not governed by **ERISA**.

Y.   **Theft** means the unlawful taking of **Money**, **Securities** or **Property** to the deprivation of an **Insured**, solely for the purposes of Insuring Clause A, or a **Client**, solely for the purposes of Insuring Clause I.

Z.   **Third Party** means any natural person who is not an **Employee**.